EVAN L. BOHNET, APPELLEE, V. KATHERINE A. BOHNET,
NOW KNOWN AS KATHERINE A. BALERUD, APPELLANT.

___ N.W.2d ___

Filed April 14, 2015.    No. A-14-492.

1. **Child Custody: Visitation: Appeal and Error.** Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial judge, and although reviewed de novo on the record, the trial judge's determination will normally be affirmed absent an abuse of discretion.

2. **Judgments: Words and Phrases.** A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result.

3. **Modification of Decree: Appeal and Error.** Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion.

4. **Child Custody.** Ordinarily, custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.

5. **Modification of Decree: Child Custody: Proof.** The party seeking modification of a decree of dissolution bears the burden of showing a material change of circumstances affecting the best interests of a child.

6. **Modification of Decree: Child Custody.** Whether considering a modification of custody or a proposed removal from the state, the best interests of the children are the paramount considerations.

Appeal from the District Court for Lancaster County: ANDREW R. JACOBSEN, Judge. Affirmed.

Terrance A. Poppe and Andrew K. Joyce, Senior Certified Law Student, of Morrow, Poppe, Watermeier & Lonowski, P.C., L.L.O., for appellant.

Peter C. Wegman and Jesse S. Krause, of Rembolt Ludtke, L.L.P., for appellee.

IRWIN, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

The only issue raised in this modification of custody appeal is whether the analysis required when a parent seeks to relocate with a minor child from Nebraska to another state also applies to intrastate moves. Specifically, does *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), apply

when a move within Nebraska creates a distance of 148 miles
between parental households and therefore requires modifica-
tion to an existing parenting plan. We conclude that while
some of the longer distance moves within the state might
benefit from a more thorough removal analysis as set forth
in *Farnsworth*, we decline to require it until such time as the
Legislature or our Supreme Court directs us to do so. Further,
finding no abuse of discretion in the district court's modifica-
tion order, we affirm.

## BACKGROUND

Katherine A. Bohnet, now known as Katherine A. Balerud
(Katie), and Evan L. Bohnet are the parents of Madelynn Bohnet
(Maddie), born in 2008. Katie became pregnant with Maddie
at age 16 while a junior in high school in Columbus, Nebraska.
After graduating from high school in 2009, Katie commenced
her college education at the University of Nebraska-Lincoln.
Evan had graduated from Columbus High School in 2008, and
he also attended the University of Nebraska-Lincoln. Katie and
Evan were married on July 24, 2010; Evan filed for divorce
in June 2011. The parties both signed a property settlement
agreement and parenting plan, and on September 15, the
Lancaster County District Court entered an order dissolving
their marriage. Legal custody of Maddie was awarded jointly
to the parties, and physical custody was awarded to Evan sub-
ject to Katie's reasonable parenting time. The parenting plan
agreed upon at that time provided for a "9/5 parenting time"
schedule, which gave Katie parenting time with Maddie every
other Thursday afternoon to the following Monday morning,
and during the "off" weeks, parenting time from Thursday
afternoon until Friday morning. The parties also agreed to
alternate weeks during the summer.

Upon Evan's graduation in May 2013 with a degree in
"[s]econdary math" (grades 7 through 12), he accepted a
teaching position in South Sioux City, Nebraska, about 148
miles away from Lincoln, Nebraska, where Katie still resided.
On May 13, Katie filed a "Complaint for Modification of
Decree and Praecipe," wherein she alleged a material and sub-
stantial change of circumstances had occurred since the entry

of the decree in that Evan had accepted a job in South Sioux City, that he was planning to move there, and that this would make it impossible for her to exercise her parenting time as set forth in the decree. Katie requested custody of Maddie, and she asked for orders pertaining to parenting time, child support, and attorney fees. Trial was held September 16, 17, and 20.

At trial, Evan testified that he looked for work in Lincoln but that nothing was available, so he gradually expanded his search radius and received the job offer from South Sioux City Community Schools. Evan claimed that he was offered the job in mid-April 2013 and that he talked with Katie about it the first week of May before signing a contract. At the time of trial, he was an "8th grade math teacher" earning $33,500 per year. Evan purchased a home in South Sioux City with help from his parents on the downpayment, and Maddie started kindergarten at Cardinal Elementary School (Cardinal) in South Sioux City, which school is located four to six blocks from Evan's home. Katie testified that Maddie's teacher at Cardinal is "wonderful" and that she did not have "any major concerns about the school in particular."

Katie testified that she hoped to graduate in December 2013 with a major in "special education mild/moderate secondary[, grades] 7 through 12." At the time of trial in September 2013, she was working as a paraeducator with students "who have severe and profound disabilities" at a Lincoln high school. Her hours were 8 a.m. to 3 p.m., Monday through Friday, and she was earning $12.95 per hour. Her hope was to secure a teaching position at the same high school in the next school year following the completion of her degree. Katie also worked part time at a golf course in North Bend, Nebraska, managed by her father. Her regular hours there were Thursdays from 4:30 to 8:30 p.m. and then occasionally on weekends. Maddie would accompany her to Columbus where Katie's mother would watch Maddie until Katie was done with work in North Bend.

Both parties and the witnesses who testified about their observations of Maddie all agreed in various complimentary words that Maddie is "[a]ctive, fun, funny, a ball of energy,"

"athletic," "bright," "easy to get along with," "popular," "out-
going," and "you can't help but love her" (Evan's testimony);
is an "excited, happy, five-and-a-half-year-old [who] loves to
be a helper," "loves to spend time outside," and is "very well
behaved" (Katie's testimony); is "very happy" and loves Katie
"[v]ery much" (testimony of a friend of Katie's family since
1990); "loves to spend time with [Katie,] depends on [Katie],"
and is "healthy," "happy," and "well adjusted" (testimony of
a friend of Katie's family for 16 years); is "very happy" and
has a "[v]ery loving, very positive" relationship with Katie
(testimony of a relative of Katie's by a former marriage who
is a fourth grade teacher at Pyrtle Elementary School (Pyrtle)
in Lincoln); is "happy, healthy and well adjusted most of the
time" (testimony of Katie's mother); and is "a happy, healthy,
well-adjusted girl," and that Maddie and Evan have a "very
loving relationship," and that "Maddie loves [Evan]" (testi-
mony of Evan's sister). The sum of the testimony reflects a
happy, well-adjusted child with a healthy relationship with
both parents.

A witness from the Nebraska Department of Education,
Dean Folkers, was called by Katie to testify about data col-
lected from Nebraska's public schools and to engage in com-
parisons between Pyrtle in Lincoln (where Katie wished to
enroll Maddie due to proximity to her home) and Cardinal
in South Sioux City. In one example, Folkers explained that
86.49 percent of the students who took the Nebraska State
Accountability third grade mathematics test at Pyrtle met or
exceeded the expectation as compared to 60.34 percent at
Cardinal. The poverty percentage at Cardinal was 67.60 per-
cent, and at Pyrtle it was 23.68 percent. Folkers explained that
the poverty percentage is based upon a student's eligibility for
free or reduced lunch. Folkers also discussed "adequate yearly
progress," which he explained is a designation stemming from
the "No Child Left Behind" requirements. As part of those
requirements, schools must meet certain criteria to receive
funds for extra support in reading and other learning areas.
Schools must meet a benchmark established by the state, and
Folkers testified that both schools met this benchmark, except
that Cardinal's special education students did not meet the

benchmark established for such students. Folkers stated that with regard to reading and mathematics improvement scores, Cardinal had improved in every category from 2010-11 to 2011-12; whereas, Pyrtle had declined in 5 of the 10 categories in that same year.

A licensed psychologist employed by the university began counseling Katie in February 2011. She largely discussed Katie's need to develop "her internal sense of who she is . . . raising her self-confidence . . . and her self-esteem." The psychologist testified that Katie's "trajectory has been upward and strong . . . [h]er self-reflection and growth . . . has been very solid and I feel good about her progress and maturity." She did not have any concerns about Katie having custody of Maddie.

Dr. Lisa Blankenau, a licensed psychologist with a specialty in families, couples, and court evaluations for families, testified about the impact of moves on a parent's relationship with a child. Dr. Blankenau met with Katie only twice in July 2013 and once in August; she never met either Evan or Maddie. She was not asked to render an expert opinion with respect to custody in the pending case; rather, Katie's counsel elicited testimony about parenting schedules generally and the impact of decreased parenting time. Dr. Blankenau stated that she advocates for 10 days with one parent and 4 days with the other parent (10/4 schedule) or 9 days with one parent and 5 days with the other parent (9/5 schedule). She explained that it takes an adjustment period of 2 days before "real parenting occurs." Dr. Blankenau testified that if a parent had

> four or five days in a row, you'd have the first couple days of just adjustment and then after that, you'd be able to do real parenting: getting them on a schedule, doing some caretaking activities, doing other things besides just entertainment and fun things. And so that would make the parenting bond with both parents stronger and a less disruption to a child's life.

Dr. Blankenau testified that time with the child is important to develop a close bond and that if the distance "gets too far away," then it is hard to find that needed time. She did not

consider "Skype . . . an appropriate substitute for one-on-one parenting time," in particular with children of Maddie's age, because they do not have "the attention span to spend . . . much time on Skype." Also, "[Skype is] not a physical presence," and "[p]art of being a parent is being able to kiss and hug and love them and hold hands and just that physical touch that parents have . . . ." And based on studies, "without a strong bond with both parents, children . . . go one of two ways. They can be more aggressive and [act] out, or they can be more passive and develop more depressive like symptoms." Further, "[c]hildren with a strong bond with both parents tend to be more successful in their life overall. They . . . do better in school . . . have more educational goals . . . are more stable . . . are less likely to break . . . important rules like the law[, and are] less likely to have mental health issues." Dr. Blankenau stated that "[t]here is a definite difference between the two populations." Dr. Blankenau also testified generally about "alienation of affections," but did not address anything specific to the case at hand. On cross-examination, Dr. Blankenau was asked whether she had any other recommendations on how to make weekend parenting work besides Friday evening to Sunday evening, given that Evan lived in South Sioux City and Katie lived in Lincoln. Her response was, "Not with that distance. I don't know how else it would work."

Katie and Evan both testified about their relationship with Maddie, their activities, and why one location was better than the other. The evidence reveals two good parents, each with good intentions for themselves and for Maddie. Evan agreed in several instances that he could improve on his communication with Katie and expressed his intention to do so. And understandably, Katie was concerned about the reduced parenting time having a negative impact on her relationship with Maddie.

The district court entered its "Findings" on February 24, 2014, concluding that "a material and substantial change in circumstances requiring the modification of the previous decree" existed and that legal custody shall be awarded jointly, with physical custody awarded to Evan. Parenting time for Katie was modified to every other weekend from

Friday at 6 p.m. until Sunday at 6 p.m. Katie was to pick Maddie up in South Sioux City at the commencement of her parenting time; Evan was to pick her up in Lincoln at the conclusion of that parenting time. Katie was ordered to pay child support of $145 per month; this reflected a downward deviation from the $189 per month child support calculation in consideration of transportation expenses necessary for Katie to exercise her parenting time. Health insurance and medical costs were also addressed. An "Order" was entered the same day, and following a motion for new trial filed February 25, an amended order was filed April 30, which changed the transportation requirement to the parties meeting at a mutually agreed-upon location in Blair, Nebraska, at the commencement of Katie's parenting time, with Evan picking Maddie up from Katie's home at the conclusion of that parenting time. Katie timely appealed.

## ASSIGNMENT OF ERROR

Katie's sole assignment of error is that the district court abused its discretion by awarding physical custody to Evan without applying the factors set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), to determine if the move was in Maddie's best interests.

## STANDARD OF REVIEW

[1,2] Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial judge, and although reviewed de novo on the record, the trial judge's determination will normally be affirmed absent an abuse of discretion. *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

[3] Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

## ANALYSIS

The parties' September 15, 2011, divorce decree provided for joint legal custody, with physical custody of Maddie awarded to Evan. Katie's parenting time was based on the 9/5 schedule described earlier. Following the modification trial, the district court's February 24, 2014, order found that a material and substantial change in circumstances existed that required modification of the original decree. Although the district court did not change the legal and physical custody as previously ordered, it did modify Katie's parenting time from the 9/5 schedule to every other weekend from Friday at 6 p.m. until Sunday at 6 p.m. As a result, Katie's parenting time went from five overnights to two overnights in each 14-day period.

Referring to *Farnsworth, supra*, Katie argues that "Nebraska Courts have applied the *Farnsworth* removal factors in several cases where the distance moved by the removing parent was comparable or significantly less than [Evan's] 148 mile move currently before this Court." Brief for appellant at 17. Katie directs us to the following:

> *Keiser v. Hohenthaner*, A-11-590, 2012 WL 1869269 (Neb. Ct. App. May 22, 2012) ([r]emoval analysis applied to 5-10 mile move from Crofton[, Nebraska,] to Yankton, South Dakota); *Curtis v. Curtis*, 17 Neb. App. 230, 759 N.W.2d 269 (2008) ([r]emoval applied to 17.6 mile move from Falls City[, Nebraska,] to Big Lake, Missouri); *Ginter v. Ginter*, A-07-752, 2008 WL 373165 (Neb. Ct. App. Feb. 12, 2008) ([r]emoval analysis applied to 142 mile move from Nebraska to Iowa); and *State ex rel. Bach v. Keiper*, A-04-439, 2005 WL 41547 (Neb. Ct. App. Jan. 11, 2005) ([r]emoval analysis applied to 280 mile move from Chadron[, Nebraska,] to Denver[, Colorado]).

Brief for appellant at 17.

Katie argues that the underlying concern should be "the impact that the relocation has on the child, not whether arbitrary state lines are crossed," brief for appellant at 20-21, and that applying *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), to a 17-mile move as in *Curtis v. Curtis*, 17 Neb. App. 230, 759 N.W.2d 269 (2008), but not to a

220-mile move as in *McLean v. McLean*, No. A-08-879, 2009 WL 1270492 (Neb. App. May 5, 2009) (selected for posting to court Web site) (move from Ponca, Nebraska, to rural Brewster, Nebraska), produces "arbitrary and illogical results," brief for appellant at 21. We do not disagree that it may seem illogical to require the more extensive *Farnsworth* removal analysis in situations involving some of the short distances noted above simply because a state line has been crossed, but not require such an analysis when a greater intrastate distance is involved, such as in the present case. However, as Katie acknowledges, this court, in unpublished opinions, has declined to apply the *Farnsworth* removal analysis to significant moves within this state's border. Katie cites to *Houchin v. Houchin*, No. A-11-483, 2012 WL 882450 (Neb. App. Mar. 13, 2012) (selected for posting to court Web site), and *McLean, supra*. Katie nevertheless argues that the removal analysis in *Farnsworth, supra*, was "borrowed" from other states, such as New York, Massachusetts, and New Jersey, and that since "the Nebraska Supreme Court has not indicated whether its removal analysis should be applied to in-state moves, this Court should look to those states from which" *Farnsworth* was modeled. Brief for appellant at 18,19. As indicated previously, while some long-distance intrastate moves might benefit from a thorough *Farnsworth* analysis when considering custody and parenting time issues within the state, neither our Supreme Court nor the Legislature has made that the current state of the law, and therefore, we continue to decline to require the application of the *Farnsworth* analysis to intrastate moves and cannot say that the district court abused its discretion in failing to do so.

We would also note that in *McLaughlin v. McLaughlin*, 264 Neb. 232, 248-49, 647 N.W.2d 577, 592 (2002), the dissent touched on this issue of intrastate moves being handled differently than interstate moves, stating, "It is also true that the distance between Omaha and Huron, South Dakota, is not so great that it would absolutely preclude regular visitation; as the majority correctly notes, this distance is no greater than some intrastate relocations which would not require court approval."

[4-6] Until directed otherwise, the current law applicable to requests for modification of custody and/or parenting time that arise due to an intrastate move of a custodial parent would fall under the propositions of law generally found in custody modification cases, that being that ordinarily, custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000). Further, the party seeking modification of a decree of dissolution bears the burden of showing a material change of circumstances affecting the best interests of a child. *Id*. Whether considering a modification of custody or a proposed removal from the state, the best interests of the children are the paramount considerations in our determination. *Id*.

When considering Maddie's best interests, based upon the record before us as discussed in relevant part earlier, we cannot say that the district court abused its discretion in leaving custody as previously ordered and in modifying the parenting plan to accommodate the distance created by Evan's new teaching job in South Sioux City. Certainly, the decreased weekly parenting time for Katie is unfortunate given what appears to be a very healthy mother-child relationship. We are also mindful of Dr. Blankenau's compelling testimony regarding the impact of decreased parenting time on a parent's relationship with a child. However, even Dr. Blankenau had to admit that given the distance between the residences, other than the Friday to Sunday night parenting schedule, "I don't know how else it would work." Accordingly, the district court did not abuse its discretion in modifying the parenting plan to accommodate the distance between the parties' households.

## CONCLUSION

The district court's February 24, 2014, modification order, as amended April 30, is affirmed.

Affirmed.