IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE ON BEHALF OF GAIGE R. V. JAMES M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA ON BEHALF OF GAIGE R., A MINOR CHILD, APPELLEE,

V.

JAMES M., APPELLEE, AND CYNTHIA W., APPELLANT.

Filed August 9, 2016.    No. A-15-698.

Appeal from the District Court for Kimball County: DEREK C. WEIMER, Judge. Reversed and remanded with directions.

Adam R. Little, of Ballew, Covalt & Hazen, P.C., L.L.O., for appellant.

No appearance for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

INBODY, Judge.

## I. INTRODUCTION

Cynthia W. appeals from the order of the Kimball County District Court awarding custody of Gaige R. to the child's father, James M., and allowing James to remove Gaige to Colorado.

## II. STATEMENT OF FACTS

Cynthia and James, who never married, are the parents of Gaige, who was born on September 12, 2009. Shortly after Gaige's birth, a paternity action was commenced. In June 2010, James' permanent child support obligation was set at $313 per month and he was ordered to provide health insurance coverage for Gaige if Gaige was eligible under James' coverage. After James was delinquent in his child support payments, a hearing was held after which the district court found that the "evidence supports the finding that [James] is the father of [Gaige]." The court found James in contempt but entered a purge order that James was to pay the current child support

- 1 -

order in full and $50 per month toward arrears. At the time of trial, James testified that he was not only current on his child support payments but was $400 ahead.

On August 4, 2014, James filed a complaint to, among other things, modify child support, and determine custody and parenting time. This complaint was later amended, in February 2015, to also request a determination of whether Gaige could move to Colorado where James had found employment and relocated. Cynthia filed a cross-complaint to establish child custody and modify child support requesting legal and physical custody of Gaige and requesting permission to remove Gaige from Nebraska to Texas because Cynthia's husband is in the military and was stationed there. Cynthia was allowed to amend her cross-complaint in April 2015 to reflect that Cynthia might be moving to South Dakota based upon her husband's military assignment and requested permission to remove Gaige from Nebraska to Texas or South Dakota.

On October 2, 2014, the district court filed an order granting Cynthia temporary legal and physical custody of Gaige subject to James' parenting time which was set forth in detail in the court's order. This order also temporarily reduced James' monthly child support to $113 "[d]ue to the expense of travelling to and from Burt County[,] Nebraska for parenting time."

A 3-day trial was held in April and May 2015. During the trial, testimony centered around several issues: James' involvement in Gaige's life; Cynthia's testimony regarding her request for custody; James' testimony regarding his request for custody; testimony regarding Dr. Linda Hunter, the clinical psychologist who briefly saw Gaige; and testimony from other witnesses. For the ease of the reader, we set forth the testimony in these aforementioned main categories.

### 1. JAMES' INVOLVEMENT

#### (a) Cynthia's Pregnancy

Cynthia testified that James did not provide any financial support to her during the time that she was pregnant, did not attend any medical appointments with her, and did not contact her to see how her pregnancy was progressing. James admitted he did not support Cynthia financially during her pregnancy. He stated he did not go to any medical appointments with Cynthia during her pregnancy because he never knew of any, but claimed that he did phone her a few times to see how she was doing.

#### (b) Gaige's Birth

Cynthia stated that James was not present at Gaige's birth, but he did come to the hospital the following afternoon. Cynthia admitted that she did not tell James that she was having the baby, but "guess[ed]" James found out from his parents, even though she did not inform James' parents of Gaige's birth.

According to James, in September 2009, he was living in Lincoln. On the day Gaige was born, he was at drills for the Army National Guard in Lincoln doing a physical test and performing maintenance repairs on vehicles. He learned about Gaige's birth from his mother and he was allowed to leave drills immediately. Gaige was born just after midnight and James arrived in the morning and was at the hospital for a couple of hours. James' mother testified that James was at the hospital shortly after Gaige was born and he was able to hold Gaige, was very proud, and had tears in his eyes.

(c) Parenting Time With Gaige

After Gaige's birth, Cynthia and Gaige lived with her mother, Cindy, in Cindy's home until March 2014, when they moved to Cheyenne, Wyoming. Cynthia worked several different jobs to provide for Gaige, she nursed him, changed his diapers, gave him baths, and took him to medical appointments. She further testified that James did not handle any of the primary caregiving and did not provide any financial support.

James stated that during Gaige's first year, Cynthia did not tell him about how Gaige was doing even though he called "a few times." Cynthia disputed James' testimony that he would contact her to see how Gaige was doing; she stated that James "never called." Cynthia testified that she did not have any contact with James during Gaige's first year and that she never contacted James because she was busy with an infant and working two different jobs and she believed that if he wanted to know anything about Gaige he would contact her. James admitted he did not ask to attend any of Gaige's medical appointments because he was never informed about them; however, he also admitted he did not ask Cynthia if Gaige was going to his well-baby checks or getting his vaccinations. James further admitted he did not give Cynthia any financial support for Gaige.

James testified that during Gaige's first year, he was present at a few events at which Gaige and Cynthia were also present. He stated that he saw Gaige a few times during the first 6 or 7 months of Gaige's life. Additionally, during 2010, James testified he knew that he had spent time with Gaige on January 7, 8, and 19; March 15; July 6 and 10; and December 12 and 14; because he had pictures to corroborate those dates. He also stated there may have been other times that he saw Gaige, but no pictures were taken. James was not present at Gaige's first birthday party and did not schedule his own birthday party for him.

James admitted that during the second year of Gaige's life, he did not call Gaige every month, but he trusted that Cynthia was taking care of Gaige. He also was not invited to, nor present at, Gaige's second birthday party in 2011.

On Easter 2012, James was invited to an Easter Egg Hunt with Cynthia, Gaige, and Cindy. On Gaige's third birthday in 2012, he was not invited by Cynthia, and was not present at that birthday party, but he was able to see Gaige the day after Gaige's birthday. James did not get to have his agreed-upon parenting time for Christmas 2012 because Cynthia did not allow him to pick up Gaige.

James stated that he saw Gaige about 2 or 3 times during the first half of 2013. James was present at Gaige's fourth birthday party in September 2013 which was held at Chuck E Cheese. After Gaige's fourth birthday party, James asked to begin visitations and he and Cynthia came to verbal agreement that James could have parenting time one weekend per month from Friday at about 6 p.m. until Sunday at about 6 p.m. with the parties meeting in Cheyenne, Wyoming, for the exchange. According to James, the parties also agreed that they would begin alternating holidays.

After the parties' reached this agreement, James stated that he had two full visits with Gaige but, during his visit in November 2013, he took Gaige back on Saturday evening because Gaige was complaining of a really bad stomachache and said he wanted his Grandma Cindy. James testified he had a conversation with Cynthia after the visit that ended early about how the visits

were going and he requested another visit, which Cynthia denied. James did not get his parenting time with Gaige in December 2013 or his Christmas visitation that year. James stated that Cynthia told him that "Gaige did not want to spend time with me after taking him home early that weekend the month before." James testified that he tried calling Cynthia requesting to see Gaige. On June 5, 2014, Cynthia texted James to let him know she had a new phone number; at that point, James asked if he could have a visit with Gaige.

Cynthia's version of these events was slightly different. According to Cynthia, James' first weekend visitation was the end of September 2013, which went well. The second visit took place in October and James contacted Cynthia at 9 p.m. on Saturday evening stating that Gaige was hysterical, would not stop crying, and she needed to come get him. James asked for another visit in October, which did not occur, because when Cynthia talked to Gaige about the visit he became "hysterical" and did not want to go. According to Cynthia, there was no contact between James and herself until June 2014 when Cynthia contacted James to let him know her new cell phone number. At that time, James commented that there was a family reunion coming up that he would like Gaige to attend, but Cynthia told him that it had been a long time since he had seen or talked to Gaige and that he should call a few times a week to build his relationship with Gaige. However, according to James, he had contacted Cynthia by text just two weeks earlier to ask if he could see Gaige on the Fourth of July. Cynthia stated that James did not contact her again until right before she was to give birth to Preston W., her first child with her current husband, and she stated that they wanted Gaige to be present to meet his sibling. After Preston was born on July 5, 2014, Gaige was the third person to hold Preston and he was very happy and very excited.

James testified that in June and July 2014, he did not have parenting time with Gaige. This led him to file the complaint on August 4, 2014, to determine, inter alia, custody and parenting time. James testified that, at that point in time, he was at a place where he could financially pay an attorney to pursue parenting time with Gaige. James did get his October parenting time, but he did not get Gaige's school or activity information from Cynthia. He was also to have Tuesday and Thursday telephone calls with Gaige and, since the 5:00 time was a busy time at his work, he set an alarm on his phone so he could step out and make the call. James does admit he missed one or two calls from October 2014 through March 2015. James had parenting time in November and December 2014, but could not financially afford a second visit in December. He did have parenting time over Christmas and his weekend parenting time in January and February 2015.

Additionally, in February 2015, James and Cynthia agreed that James could get Gaige earlier for parenting time and then drop Gaige off on Monday morning before school which allowed James to have Gaige more days of the month and make one trip for parenting time with Gaige instead of two trips. James testified that he continued to call Gaige, but acknowledged that sometimes Gaige did not want to talk. During March 2015, Gaige had a break from school during which time James was supposed to have parenting time; however, he did not get that parenting time because Cynthia and Gaige were in Texas.

Cynthia testified that after the litigation began, she did not allow James' family to see Gaige because she did not want them manipulating Gaige throughout the process. Once the temporary visitation order was put in place, Cynthia abided by the court's orders. The first visit occurred in Lincoln and went well. However, after Gaige returned from the first visit, he was quiet, confused,

and did not say much. According to Cynthia this behavior was not normal for Gaige and that, usually, he was a happy child. After other visits, Gaige would come home hungry and tired.

The parties agreed to modify the temporary order because James did not have the funds to travel twice per month for visitation; thus, the parties modified James' parenting time from two weekends per month to one weekend per month that started on Wednesday and ended on Monday morning. This arrangement worked well for Gaige. James was to have telephone visits every Tuesday and Thursday from 6:00 to 7:00 Central Time. According to Cynthia, James usually called at least once per week and missed four or five calls. Cynthia testified that she never denied James any parenting time or telephone visits under the temporary order. Cynthia expressed concern over James' parenting because a "couple of times" Gaige returned home very sick with a stomachache and diarrhea which she suspected was from eating dairy products because Gaige is lactose intolerant. Cynthia also expressed concern that Gaige did not look like he had taken a bath and was "really hungry and tired." Additionally, Gaige's behaviors changed in that he did not want to go outside and play and he was eating all day.

James testified that Gaige has a lactose problem but testified that "[d]epending on what it is, as long as you are really careful and in moderation, small amounts, he's okay." James denied ever giving Gaige milk when he knew that Gaige could not have it and that he has never seen another family member offer Gaige milk.

James admitted that Cynthia had made efforts to arrange for Gaige to have visits with James' extended family.

## 2. CYNTHIA'S TESTIMONY REGARDING HER REQUEST FOR CUSTODY

Cynthia testified that she is 25 years old and is in good health. She is married to Brandon W. who is a captain in the United States Air Force. They have one child of the marriage, 10-month-old Preston, who is Gaige's half brother.

When Cynthia and Brandon married, they lived in Cheyenne, Wyoming. However, after Brandon was ordered to report to Alabama for specialized military training, Cynthia, Gaige, and Preston, moved to Tekamah, Nebraska, to live with Brandon's parents. They have lived in Tekamah since July 2014 and, since living in Tekamah, Gaige has attended preschool Monday through Thursday afternoons. Gaige was described as nice and kind to the other children in his class and he had a lot of friends. Gaige also played T-ball, played with friends, and rode his bicycle.

After Brandon finished officer training in Alabama, he was stationed in Texas for intelligence officer training in November 2014. During the time that Brandon was stationed in Texas, Cynthia, Gaige, and Preston visited him twice: over Thanksgiving 2014 and in March 2015. During the Thanksgiving visit, Gaige missed three days of school and, during the March visit, Gaige missed eight days of school. Cynthia testified that she felt it was important for Gaige to see Brandon because Gaige was upset about the separation and Gaige did schoolwork every day while they were in Texas, such as practicing his letters, numbers, and colors. Cynthia further testified that the absence did not set Gaige back in school. Gaige did "very well" in school, graduated from preschool, and was on track to start kindergarten in the fall.

Cynthia testified that she was requesting that the court award her legal custody of Gaige because she has always made the medical, educational, and mental health decisions for Gaige. She further testified that she would not be able to make those decisions with James because she does not trust James' judgment. She gave examples such as James giving Gaige dairy products even though Gaige is lactose intolerant and allowing Gaige to go into a public restroom by himself. Further, she testified that she and James are not able to communicate well about Gaige and there is severe animosity between herself and James. She testified that she has been trying to communicate better with James by trying to talk to him and to be reasonable with him and to be accommodating with some of James' requests to amend the temporary visitation order.

Cynthia objected to James' request to remove Gaige to Colorado because she has been Gaige's primary caregiver and she felt it was in Gaige's best interests to remain in her care. She further testified that she felt it would have a negative effect on Gaige if he were not in her custody because Gaige has always been in her care, she is the only consistent caregiver in his life, and James has not been consistent in his visitation.

Cynthia described her relationship with Gaige as "really good" and said that they do things like go to the park, watch movies, and she taught him to tie his shoes, and Gaige helps her with Preston. Gaige's relationship with Preston is "really good" and "he loves his little brother." Gaige will do things like grab a diaper or pick out an outfit for Preston or help Cynthia put socks on Preston. Cynthia testified that Brandon and Gaige get along "really well" and they golf, play catch, and go on walks.

Cynthia testified that she is requesting to move Gaige to South Dakota because Brandon had been transferred there and was scheduled to report to Ellsworth Air Force Base by June 24, 2015. Cynthia testified that her request was not done to frustrate James' relationship with Gaige or to try to manipulate James; rather, she was making the request so her family could be together.

Cynthia testified that the family planned to live in Rapid Valley, South Dakota, which is located approximately 15 minutes from Ellsworth Air Force Base; 4 hours from Kimball, Nebraska; and about 5 hours from Fort Morgan, Colorado. They purchased a brand new 5-bedroom, 3-bathroom home with a fenced-in backyard located on a cul-de-sac and located right around the corner from where Gaige would attend school. Cynthia had already enrolled Gaige in the Valley View Elementary School and school was scheduled to begin on August 24, 2015. Gaige would attend elementary school Monday through Friday from 8 a.m. until 3 p.m. The elementary school has playgrounds, a track for track and field events, a swimming pool, basketball, a math club, and a reading club. Other activities available to Gaige in the community include Taekwondo, YMCA, rock climbing, basketball club, swimming club, river safety activities, and other activities on the Air Force base. Cynthia and the family would be able to participate in different activities on the Air Force base, including a Mom's Club, other support groups, family groups, family outings, and family picnics.

According to Cynthia, the move to South Dakota would enhance Gaige's life because he would be around his family and there would be family support though the Air Force. The move would also enhance Cynthia's life because she will be with her husband and her children, live in a nice home, in a nice area, and be close to family. Further, the family receives benefits from the military including medical insurance with no out-of-pocket cost for co-pays or deductibles. Gaige

is covered under this plan, but they would not be able to cover him if Cynthia was Gaige's noncustodial parent.

Cynthia testified that if the court granted her custody and allowed her to remove Gaige to South Dakota, she proposed that James have weekend visitation once per month starting at 6 p.m. on Friday and ending at 6 p.m. on Sunday, a couple of weeks in the summer, and alternating holidays, and that she was open to James having additional time with Gaige whenever he was close to Rapid City or whenever they were close to Fort Morgan. She further testified that she felt that James should come to see Gaige because 10 hours round trip in a vehicle was too long for a child; however, she was open to meeting James halfway for an exchange. She further testified that she was open to having James being able to call Gaige whenever he wanted. Cynthia testified that she felt that it was important for Gaige to continue his relationship with his extended family, including James' family, and she was willing to facilitate visitations with James. However, Cynthia admitted on cross-examination that she told her mother that she would not see Gaige unless James is awarded custody.

At the time of trial, Cynthia was not currently employed because she was taking care of Gaige and Preston. However, Cynthia testified that after moving to South Dakota, she planned to finish school and work. She stated that she had applied for different jobs at the hospital there including phlebotomist, respiratory assistant, and respiratory therapist assistant, and she had applied at a couple of different banks. She planned on attending the Rapid City branch of South Dakota University. Prior to being a stay-at-home mother, Cynthia worked at Blue Cross Blue Shield of Wyoming putting together new customer insurance packets earning $12.69 with health and dental benefits and before that she worked at the Kimball County sheriff's office.

### 3. JAMES' TESTIMONY REGARDING HIS REQUEST FOR CUSTODY

In 2003, James joined the Army National Guard and from November 2006 to December 2007, he was deployed to a combat zone in Iraq. During his military service, James suffered injuries to his knees, spine, broken fingers, loss of hearing and a traumatic brain injury from a concussion. After James' deployment ended, his body ached and it was hard for him to get up and around most of the time, lifting heavier objects was a lot more difficult, and for two years he could not make a full fist or hold onto a wrench securely. In mid-2008, James received a full medical discharge from the Army, which means that the injuries he sustained while in the military would no longer allow him to serve in the military. However, James' last drill with the Army National Guard was in October 2009 and lasted 2 weeks. From 2008 to 2010, James' disability was rated at 40% and he was receiving disability payments of $1,493 per month, plus the VA paid for his medical care. During this time, James could work other jobs.

In 2010, the VA diagnosed James with Post Traumatic Stress Disorder (PTSD), after which James was granted 100% disability receiving payments of $3,300 per month and full health benefits including dental and vision.

Despite being on full disability, in 2014, James graduated from the Lincoln College of Technology where he had learned auto collision repair. He realized there was no work for him in Lincoln, but he learned of a job opportunity as a mechanic in Fort Morgan, Colorado, through his

fiance who had ties to Colorado. James moved to Fort Morgan in mid-August 2014 and accepted a job with Aulick Leasing with organization headquarters out of Scottsbluff, Nebraska. His hours are usually from 6 a.m. until 6 p.m. James admitted that are sometimes when he is on call overnights from 6 p.m. to 6 a.m. and there may be weeks where he works extra hours because a truck breaks down, but his fiance would be there to stay with Gaige.

James' employment is classified as seasonal so he does not get benefits such as a 401K or health insurance and does not have health insurance available to cover Gaige. During the summer months of 2015, James worked at Aulick's headquarters in Scottsbluff to help build new trucks to replace older trucks in the company's fleet. During the summer months, James averages 40 hours per week and was provided an apartment by the company. Although James is making less than he would by staying home with his disability pay and, since he is working, he loses his disability payments, he said "It gets me out of the house. . . it drives me nuts not to work." He testified that "I have to work. I feel that I am able-bodied to do a job. There are other veterans that are out there that are collecting money that do deserve it."

James rents a 3-bedroom home in Fort Morgan, Colorado, with a backyard, where he lives with his fiance. The kindergarten that Gaige would be attending is four blocks from James' home and has a playground. There is Taekwondo for Gaige's age group, swimming lessons, and flag football. He stated he plans on staying in Fort Morgan and to keep family close to Gaige, but that he does not need help with Gaige. James further testified that "I honestly think that what is best for Gaige would be to be with me, to be in a stable home, be safe, not have to move, be in one school and have a happy life and get to see the rest of the family." James testified that his expectations for Gaige are to have a stress-free environment, to foster Gaige's emotional and psychological development by regular school attendance, and keeping Gaige active with other kids. James also testified Gaige needs parents who could communicate and compromise and that Gaige needed stability and "he needs to be a boy."

James testified that his parenting time with Gaige makes him feel "like a dad, very important, very good." According to James, at first, when Gaige arrives for parenting time, "for a little while he's kind of shut down, kind of slow and then once he realizes the environment that he's in I mean he's five years old again and he's being a kid. He gets - his spirits are lifted, he's happy and he's running around. He's being a kid." James stated that Gaige knows that James is his dad, and he tells him that he loves him, gives him hugs, and runs to him and jumps in his arms when James arrives to pick Gaige up. James testified that Gaige has the need for a father figure, the father-son bond is extremely important, and James wants to be involved in Gaige's emotional life. James further testified that he feels that Gaige loves him very much and also loves Cynthia very much. James testified that if Gaige came to live with him, he would provide him with a loving, caring, safe environment where he will always be loved, cared for, fed and clothed, and he would attend a good school. He would also have a loving extended family. James also testified that he has arranged for Gaige to be involved in different activities if he is with James.

James also testified that he will be able to meet Gaige's emotional, physical, and developmental needs. James testified that he has nightmares and insomnia but he does not have the flashbacks consistently anymore. James stated that none of his conditions which caused the VA to give him full disability would affect him having Gaige. He testified that Gaige needs both

of his parents and he would never deny Gaige his mother. He further stated that he believed having Gaige in a school in a smaller town has the opportunity for more teacher-student activities. He also stated that he can play sports with Gaige which is important for fathers and sons. Further, Fort Morgan is only an hour away from extended family.

James admitted that throughout Gaige's life, Cynthia has provided for Gaige's physical, developmental, educational, and emotional needs. He further testified that he did not have any problems with the way that Cynthia had raised Gaige to that point "[e]xcept for the fact of letting me see him." However, he also said that lately, Cynthia has not been meeting Gaige's educational needs because Gaige had around 27 absences from school during his year of preschool.

James testified that he wanted custody of Gaige and that he did not believe joint custody would work because Cynthia does not communicate with him and in order to have a good parental relationship for a child there has to be the ability to communicate back and forth. He further testified that if he had custody, he would be able to communicate with Cynthia about what goes on in Gaige's life. James would give her the information that would be needed by both parents, including medical and school information. He further testified that if he was granted custody of Gaige, he thought it would be fair for Cynthia to have parenting time with Gaige one weekend per month, every other holiday, and Mother's Day, depending on how far away she is. If Cynthia was far away, then James said he would expect to have Gaige during the school year and for Cynthia to have Gaige during the summer months. If Cynthia were to be given custody, James felt he should have Gaige 35-50% of the time.

### 4. TESTIMONY RELATING TO DR. HUNTER

In October 2014, Cynthia placed Gaige in counseling with Dr. Linda Hunter, a licensed clinical psychologist, due to behavioral problems which Cynthia described as hitting, not listening, and anger which he expressed by clenching his fists and getting really mad. According to Cynthia, these behaviors were not normal for Gaige and she began seeing these behaviors after Gaige's third visit with James and that Gaige's well-being has changed after visits with James. Gaige attended four sessions with Dr. Hunter and, according to Cynthia, Dr. Hunter reported she felt that the visitations were a "vacation" to Gaige. Cynthia discontinued the counseling with Dr. Hunter and testified that she was in the process of getting Gaige in with an Air Force psychologist because he still has a lot of anger and he is defiant. Cynthia stated that she did not tell James about Gaige's counseling with Dr. Hunter because Dr. Hunter told her not to, explaining that she did not want James manipulating Gaige not to talk to her.

A trial deposition of Dr. Hunter was admitted into evidence as exhibit 79. An April 3, 2015 letter was received as Exhibit 55 that essentially summarized Dr. Hunter's visits with Gaige and her opinion:

> At no time during any of these visits did Dr. Hunter note remarkable or alarming comments about events taking place during Gaige's visits with his father. Gaige reported he looked forward to the visits with his father and at no time did he express concerns regarding said visits or express a desire to not attend visitation with his father. When with his father on visitation, Gaige reported they watched movies, played at the park, and ate.

Gaige also reported his father would bring things for him to play with while they were at the hotel.

Based on the sum of the visits between Dr. Hunter and Gaige, there were no concerns noted by Dr. Hunter that would lead to recommending a change in the visits between Gaige and his father.

## 5. OTHER WITNESS TESTIMONY

Cynthia's mother, Cindy, gave testimony in favor of James. She testified that Gaige and James have a good father-son relationship and that they giggle, laugh, and hug, and tell each other they love each other. Cindy testified that between Gaige's birth and March 2014, James was around Gaige "some." Further, starting in July 2014, James began requesting to see Gaige more often.

James' aunt, Cathleen Ann Sibal, testified that during the first two years of Gaige's life, on one or two occasions, Cynthia left Gaige at Sibal's home for James to visit Gaige. During Gaige's second and third year, the visitations and contacts between James and Gaige became more frequent, and some visits were overnight visits. During the visits which took place at Sibal's home, James provided the primary care for Gaige, including feeding Gaige and changing his diaper, and that he has good parental skills in caring for Gaige. Sibal testified that based on her knowledge of James and her observations of Gaige, and the fact that she has known Cynthia since she was a little girl, she believed it was in Gaige's best interests to remain close with extended family and, if James is custodial parent, Gaige will remain very close to Cynthia, and they will pull together as a family. On cross-examination, Sibal acknowledged that the majority of her contact regarding Gaige has been with Cynthia, and that Gaige was clean, well-fed, healthy, and well taken care of.

James' brother Nathan testified that James and Gaige are close and love each other. During Christmas 2014, James and Gaige spent five days together and, during that time, Nathan observed them to be happy and excited to be together. Nathan testified that it was "extremely important" for Gaige to be a part of James' life and that Gaige needs his dad. Nathan admitted on cross-examination that when Cynthia dropped Gaige off for visits with James, Gaige appeared to be clean, well-fed, healthy, and happy and that Gaige was happy to see James.

David Holt, shop foreman for Aulick Leasing, testified that he had a tragedy occur in his family and, during that time, James covered the shop for him while he was gone. This occurred during a time when James had a scheduled visitation with Gaige and, based upon Holt's knowledge, James was able to cover the shop for the weekend and take care of Gaige. Holt also testified that James set an alarm on his phone so that he would not miss his time, allowed by the court, to call Gaige.

Cynthia's mother-in-law, Cheryl W., testified that Cynthia, Gaige, and Preston have resided with her since July 31, 2014. She has had the opportunity to observe Cynthia and Gaige together and testified that Cynthia "takes total care of the children, physical, emotionally, social and intellectually. She's their mother." She makes them nutritious meals, makes sure they are clean and have clean clothes, and she and has a very close relationship with Gaige. When Gaige needs discipline, Cynthia redirects him. Cynthia plays ball with Gaige, plays golf, plays cards, games, and draws. Gaige attends preschool Monday thru Thursday when the bus picks him up between

11:30 and 11:45 and he returns home on the bus at 3:30. Gaige has missed school two or three times for illness and missed a few days when they went to Texas to visit Brandon over Thanksgiving and in March. Cheryl described Gaige as a very loving, happy child, very smart, and where he should be socially, emotionally, physically, and intellectually. According to Cheryl, before visits with James, Gaige will express that he does not understand why he has to go when he does not want to go. Also, when Gaige returns from visits with James, he is not happy and he is different than what he was when he left because he is angry, aggressive, and he is constantly trying to validate their love for him. When he returns from visits, he will hit his mom, but he does not do this prior to starting to go on visits with James. Also, when returning home from visits with James, Gaige cries and whines and does not do this before going to visit James. Cheryl testified that Gaige's behavior following visits with James concerns her very much because that behavior is not normal for Gaige. She has also observed Gaige and Preston and testified that Gaige is a "[v]ery loving, wonderful big brother to his little brother."

Cynthia's sister Mercedes testified that Gaige acts like a "totally different kid" when he returns from visits with James. She explained that normally Gaige is very calm, does not act out, does not say no or hit people, and is just generally a very good kid, but when he returns from visits with James, Gaige is disrespectful, says no, and acts out more. Mercedes described Cynthia as a caring, protective, and loving mom.

Cynthia's grandfather testified that he observed Cynthia and Gaige together and that Cynthia had very good skills as a mother and he has never had any concerns about Gaige while he was in Cynthia's care.

### 6. DISTRICT COURT ORDER

On May 26, 2015, the district court filed its memorandum order. The district court noted that, although paternity had previously been established, no final determination of custody and parenting time had yet been made. The district court proceeded to consider factors relating to custody and determined that the following factors did not weigh in favor of either parent: parental fitness; relationship of Gaige prior to the commencement of the action; Gaige's general health, welfare, and social behavior; moral fitness of the parents; the age, sex, and health of Gaige and his parents; the effect on Gaige as a result of continuing or disrupting an existing relationship; and the parental capacity to provide physical care and satisfy the educational needs of Gaige. The court noted factors of Gaige's desires and wishes and credible evidence of abuse were not relevant to its decision. The court found that factors of the respective environment offered by each parent and the attitude and stability of the parent's character weighed in favor of James.

The court also stated that, pursuant to this court's dictates in *Coleman v. Kahler*, 17 Neb. App. 766 N.W.2d 142 (2009), it considered the removal factors set forth in *Farnsworth v. Farnsworth*, 247 Neb. 242, 597 N.W.2d 592 (1999), finding that none of the three factors (motive for removal to another state, child's quality of life, impact of relocation on noncustodial parent's parenting time) weighed in favor of one parent over the other. The court granted custody of Gaige to James subject to Cynthia's parenting time, granted James' request to remove Gaige to Colorado, and denied Cynthia's request to remove Gaige to South Dakota.

## III. ASSIGNMENTS OF ERROR

Cynthia contends that the district court abused its discretion in (1) awarding custody of Gaige to James and (2) allowing James to remove Gaige to Colorado and denying her request to remove Gaige to South Dakota.

## IV. STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Shandera v. Schultz*, 23 Neb. App. 521, 526, 876 N.W.2d 667, 673 (2016); *Citta v. Facka,* 19 Neb. App. 736, 812 N.W.2d 917 (2012).

## V. ANALYSIS

### 1. Custody

Cynthia argues that the district court abused its discretion in not awarding her custody of Gaige.

In the instant case, the district court's May 26, 2015 order is the first court order assigning custody to a parent. The first issue presented to the district court was which parent should be awarded permanent custody of the child as a matter of initial judicial determination. *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009). That question must be resolved on the basis of the fitness of the parents and the best interests of the child. *Id*.

The child's best interests is the court's paramount concern when deciding custody issues. *Citta v. Facka*, 19 Neb. App. 736, 748, 812 N.W.2d 917, 928 (2012). In determining the best interests of the child in custody and parenting arrangements, the court must consider, at a minimum: (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the minor child's desires and wishes, if the child is of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the minor child's general health, welfare, and social behavior; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. Neb. Rev. Stat. § 43-2923(6) (Cum. Supp. 2014). Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb,* 268 Neb. 694, 687 N.W.2d 195 (2004); *Rommers v. Rommers*, 22 Neb. App. 606, 618, 858 N.W.2d 607, 616 (2014).

Additionally, even though removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time, in determining custody based on a child's best interests, courts give some consideration to the broad

considerations set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999) in determining whether removal is in the child's best interests. *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009). Those three broad considerations are: (1) each parents' motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent; and (3) the impact the move will have on contact between the children and the noncustodial parent, when considering reasonable visitation. *Id*.

### (a) Gaige's Relationship to Each Parent
### Prior to Commencement of Action

The evidence established that Gaige has resided with Cynthia, and she has been his primary caregiver, since his birth. They have a healthy and positive relationship. Several witnesses testified as to Cynthia's skills as a mother and that Gaige appeared to be clean, well-fed, healthy, and happy when in Cynthia's care. Even James admitted that Cynthia had provided for Gaige's physical, developmental, educational, and emotional needs throughout his life. He further testified that he did not have any problems with the way that Cynthia had raised Gaige except for their issues regarding parenting time and Gaige's recent absences from preschool.

On the other hand, the evidence also shows that James and Gaige have a healthy and positive relationship. Witnesses testified that they are happy and excited when they are together and they giggle, laugh, and hug and tell each other they love each other. However, the evidence showed that James' presence in Gaige's life has been inconsistent. We find that the district court abused its discretion in finding that this factor did not weigh in favor of one parent over the other and, contrary to the finding of the district court, we find that this factor weighs in favor of Cynthia.

### (b) Gaige's Desires and Wishes

Gaige's desires and wishes are not relevant to our determination as no evidence was adduced on this factor.

### (c) Gaige's General Health, Welfare, and Social Behavior

The evidence established that Gaige is a healthy child with a lactose intolerance which is controlled by diet. Gaige's preschool records reflect that he is kind, has many friends, and is on track academically. Gaige apparently has many interests including playing T-ball, riding his bicycle, playing with friends, and playing with his baby brother. There was some evidence suggesting that James downplayed Gaige's lactose intolerance. Cynthia testified that a "couple of times" Gaige returned home very sick with a stomachache and diarrhea, which she suspected was from eating dairy products. James acknowledged that Gaige is lactose intolerant but testified that "[d]epending on what it is, as long as you are really careful and in moderation, small amounts, he's okay." We find that the district court abused its discretion in finding that this factor did not weigh in favor of one parent over the other and, contrary to the finding of the district court, we find that this factor weighs in favor of Cynthia.

### (d) Credible Evidence of Abuse Inflicted
### On Any Family or Household Member

This factor is not relevant.

### (e) Credible Evidence of Child Abuse or Neglect
### or Domestic Intimate Partner Abuse

This factor is not relevant.

### (f) Moral Fitness of Parents

Both Cynthia and James have moved on to new, appropriate long-term relationships. This factor does not weigh in favor of one parent over the other.

### (g) Respective Environments Offered by Each Parent

The evidence established that both Cynthia and James offer Gaige appropriate environments. Cynthia testified that she and Brandon had purchased a brand new 5-bedroom, 3-bathroom home with a fenced-in backyard located on a cul-de-sac and located right around the corner from the school that Gaige would attend if she is granted custody. The elementary school has playgrounds, a track for track and field events, a swimming pool, basketball, a math club, and a reading club. Other activities available to Gaige in the community include Taekwondo, YMCA, rock climbing, basketball club, swimming club, river safety activities, and other activities on the Air Force base. Additionally, Cynthia and the family would be able to participate in different activities on the Air Force base, including a Mom's Club, other support groups, family groups, family outings, and family picnics.

James testified that he rents a 3-bedroom home in Fort Morgan, Colorado, where he lives with his fiance. The home has a backyard and the school that Gaige would attend if James was granted custody was only four blocks from James' home and has a playground. James testified that activities for Gaige to participate in included Taekwondo, swimming lessons, and flag football. He stated he plans on staying in Fort Morgan and to keep family close to Gaige, but that he does not need help with Gaige.

In sum, the environments offered by both Cynthia and James are appropriate for Gaige and neither party offered any evidence regarding the quality of schools that Gaige would attend. We find that the district court abused its discretion in finding that this factor weighed in favor of James and, contrary to the finding of the district court, we find that this factor does not weigh in favor of one party over the other.

### (h) Age, Sex, and Health of Gaige and His Parents

The evidence established the Gaige was 5 years old at the time of trial. Cynthia is in good health. James had previously been receiving 100% disability from the military and has been diagnosed with PTSD; however, he is working full-time and he testified that although he has nightmares and insomnia, none of his conditions which caused the VA to give him full disability would affect him having Gaige. This factor does not weigh in favor of one parent over the other.

### (i) Effect on Gaige as Result of Continuing
### or Disrupting Existing Relationship

Gaige will be moving to either Colorado or South Dakota; thus, his relationship with his extended family and friends will be affected. However, there is another relationship that will be

affected if James is granted custody of Gaige. Gaige has a half brother, Preston, who he loves and with whom he is close. Obviously, this is a very important relationship which would be disrupted if Cynthia is not Gaige's custodial parent. Thus, we find that the district court abused its discretion in finding that this factor did not weigh in favor of one parent over the other and, contrary to the finding of the district court, we find that this factor weighs in favor of Cynthia.

### (j) Attitude and Stability of Each Parent's Character

In making its determination, the district court found that this was the determining factor. The district court found that Cynthia had "demonstrated a real hostility and unreasonableness" to James and that she "insists that [James] demonstrate consistency in his parenting time efforts but refuses to acknowledge that in order to exercise his parenting time he must travel hundreds of miles and cover all of the expenses attendant thereto." However, the evidence established that in July 2014, after Gaige's fourth birthday party, James and Cynthia came to a verbal agreement that James could have parenting time one weekend per month from Friday at about 6 p.m. until Sunday at about 6 p.m. with the parties meeting in Cheyenne, Wyoming for the exchange. According to James, the parties also agreed that they would begin alternating holidays.

Additionally, in February 2015, the parties agreed that James could come earlier and then drop Gaige off on Monday morning before school which allowed James to have Gaige more days of the month and make one trip for parenting time with Gaige instead of two trips. Although parenting time has not gone smoothly, contrary to the district court's determination, the record does establish that Cynthia has made efforts to facilitate James' parenting time. Further, although there are travel expenses that James must incur in order to exercise his parenting time, in October 2014, the court decreased James' child support obligation by $200 per month due to his travel expenses in exercising his parenting time.

The district court further found Cynthia's credibility lacking due to her failure to forward Dr. Hunter's medical records during discovery. Cynthia testified that James' discovery requests only asked for Gaige's medical records since she had been in Tekamah and she provided Gaige's immunization records which were the only medical records she had since she moved to Tekamah. However, the evidence showed that Cynthia moved to Tekamah with the children at the end of July 2014 and she took Gaige to see Dr. Hunter in October 2014. Clearly, Cynthia was required to provide the medical records related to Dr. Hunter and she failed to do so. However, this does not mean that her character is such that she is not suited to be the custodial parent for Gaige.

James was not active in Gaige's life until recently and he has never been his primary caregiver. He acknowledges the importance of Gaige's relationship with Cynthia and states that he would foster a good relationship between them if he had custody of Gaige.

We find that the district court abused its discretion in finding that this factor weighed in favor of James and, contrary to the finding of the district court, we find that this factor does not weigh in favor of either party.

### (k) Parental Capacity to Provide Physical Care and Satisfy Gaige's Educational Needs

There is ample evidence regarding Cynthia's ability to provide physical care for Gaige and her ability to satisfy Gaige's educational needs. We find the evidence less so regarding James' ability. Thus, we find that the district court erred in finding that this factor did not weigh in favor of one parent over the other and, contrary to the district court, we find that this factor weighs in favor of Cynthia.

### (l) Each Parent's Motives for Removal

Both Cynthia and James have proper motives for relocating. James lives in Fort Morgan, Colorado where he moved in mid-August 2014 when he found employment as a mechanic. Cynthia is married to an officer in the United States Air Force and, in order to live together as a family, she must travel with him to where he is stationed. At this point in time, he is stationed in South Dakota. Since both parties have proper motives for relocating, this factor does not weigh in favor of one parent over the other.

### (m) Gaige's Quality of Life

The evidence established that, regardless of which parent is awarded custody, Gaige will be moving to a new state, to a new home, and will be attending a new school. However, Cynthia has been Gaige's primary caregiver his entire life, and the evidence is undisputed that she has done a good job. Further, if James was given custody of Gaige, this would negatively impact Gaige's relationship with his infant half brother. Thus, we find that the district court abused its discretion in finding that this factor did not weigh in favor of one parent over the other and, contrary to the district court, we find that this factor weighs in favor of Cynthia.

### (n) Impact of Relocation on Noncustodial Parent's Parenting Time

Since Cynthia lives is South Dakota and James lives in Colorado, obviously Gaige's residence will impact his parenting time with the noncustodial parent. However, since this affects both Cynthia and James equally, as this court is considering Gaige's custody as a matter of initial judicial determination, this factor does not weigh in favor of one parent over the other.

### 2. REMOVAL

Cynthia also contends that the district court abused its discretion in allowing James to remove Gaige to Colorado and denying her request to remove Gaige to South Dakota. As we stated in our custody analysis, even though removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time, in determining custody based on a child's best interests, courts give some consideration to the broad considerations set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999) in determining whether removal is in the child's best interests. *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009). Those three broad considerations are: (1) each parents' motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent; and (3) the impact the move will have on contact

between the children and the noncustodial parent, when considering reasonable visitation. *Id*. We considered these broad considerations in our custody analysis finding that two of the three considerations weighed in favor of Cynthia. Having so determined, we find it was an abuse of discretion to allow James to remove Gaige to Colorado; likewise, it was an abuse of discretion in failing to allow Cynthia to remove Gaige to South Dakota.

## VI. CONCLUSION

Based upon the foregoing balancing of factors, we determine that it is in Gaige's best interests for Cynthia to be awarded custody of Gaige subject to James' parenting time and for her to be allowed to remove Gaige to South Dakota. Thus, having found that the district court abused its discretion in awarding James custody of Gaige and in allowing James to remove Gaige to Colorado, the decision of the district court regarding custody is reversed and the cause remanded to the district court for entry of an order consistent with this opinion and a recalculation of child support. Health insurance expenses for Gaige shall be provided for by Cynthia.

REVERSED AND REMANDED WITH DIRECTIONS.