KRISTY LEE FARNSWORTH, APPELLEE, V.
JEFFREY D. FARNSWORTH, APPELLANT.
597 N.W. 2d 592

Filed July 16, 1999. No. S-97-159.

Matthew Stuart Higgins, of Cohen, Vacanti & Higgins, for appellant.

Charles O. Forrest, of Schmid, Mooney & Frederick, P.C., on brief for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

GERRARD, J.

## I. INTRODUCTION

Kristy Lee Farnsworth (hereinafter mother) seeks further review of the decision of the Nebraska Court of Appeals reversing an order of the district court which had modified a decree that dissolved her marriage to Jeffrey D. Farnsworth (hereinafter father). *Farnsworth v. Farnsworth,* 6 Neb. App. 597, 576 N.W.2d 476 (1998). In the modification order, the district court allowed the mother to relocate to Denver, Colorado, with the parties' only child, Casey Jay, born August 2, 1991. The district court also increased the father's child support obligation to $525 per month in accordance with the current Nebraska Child Support Guidelines and ordered increased visitation rights for the father. Regarding travel expenses, the parties were ordered to split the expenses for the extended summer, Christmas, and Easter break or spring vacation visits, and the father was ordered to pay the expenses for all other visitations.

The primary issue that the Court of Appeals analyzed in this case is whether the district court abused its discretion in allowing the mother to remove the minor son, Casey, from Nebraska to Colorado. The Court of Appeals determined that the district court abused its discretion when it found that the mother had proved a legitimate reason for leaving the state, and reversed the

judgment of the trial court. We have long held that the court generally will permit the removal of a minor child from the jurisdiction if the custodial parent satisfies the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent. *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994); *Demerath v. Demerath*, 233 Neb. 222, 444 N.W.2d 325 (1989). For the reasons that follow, we find no abuse of discretion by the district court in this custodial parent relocation determination; therefore, we reverse the judgment of the Court of Appeals and remand the cause with directions to reinstate the judgment of the district court.

## II. FACTUAL BACKGROUND

At the time of the original divorce decree entered May 31, 1995, both the mother and the father resided in Nebraska. The divorce decree granted the mother custody of the couple's now 7-year-old son, Casey, and ordered the father to pay $250 per month in child support. The decree also awarded the father visitation rights, which included: alternating national holidays, alternating birthdays of the child, Father's Day, 1 week beginning on Monday of the second full week of each month, every other weekend from Friday at 6 p.m. through Sunday at 6 p.m., and 6 weeks' extended summer visitation. The father's child support was reduced by 50 percent for the extended summer vacation.

On July 11, 1996, the mother filed an application to increase the father's child support obligation, thereby bringing it into conformity with current Nebraska Child Support Guidelines. The father filed an answer opposing the mother's application. The father also filed a cross-application for modification, seeking an order awarding him and the mother joint custody of Casey or, in the alternative, specific, increased, and extended visitation with Casey. The father also requested that the court prohibit the mother from leaving the local area with Casey. Subsequently, on October 16, the mother filed a motion to remove Casey from Nebraska to Denver. Pursuant to the parties' stipulation, the father had "extended visitation" with Casey during the pendency of the mother's removal motion, from November 1 through 25.

A hearing was held on the pending matters on December 13, 1996. The parties stipulated that the mother is a fit and proper person to have custody of Casey. The father withdrew the portion of his cross-application requesting joint custody of Casey. Both the mother and the father testified at the hearing.

During presentation of her case, the mother testified that she earned $24,500 per year as a corporate leasing agent at Cari Rentals in Omaha. Her job dealt with corporate furniture leasing. The mother stated that she began looking for a new job because there was no opportunity for career advancement at Cari Rentals due to the size of the company. Although she neither submitted resumes to any companies nor contacted any employment agencies in Omaha, the mother testified that she looked in the local want ads every Sunday and made calls to various companies in the area to determine if they had positions in the same line of work. After failing to find openings for identical work at other companies in Omaha, she began searching for corporate leasing opportunities in Denver.

Pursuant to her job search, the mother obtained employment with Cort Furniture Rental (Cort) in Denver. The mother testified that the position at Cort was nearly identical to her position at Cari Rentals, but with significantly more earning and career advancement potential. She testified that her starting pay at Cort would be $24,000 per year and that she expected additional commission earnings of at least $6,000 per year. Given the salary structure at Cort, the mother anticipated earning over $40,000 annually after her first year there. The mother also noted that Cort offered a considerable number of fringe benefits that Cari Rentals did not provide, including paid holidays, health and dental insurance, and a profit-sharing plan. Because Cari Rentals was a small, local company with only one owner and one supervisory-level position above her position—compared to Cort, which is a nationwide business with numerous levels of management—the mother said she saw much more potential for promotion in Denver.

The mother further testified that she always wanted to live in Denver and that she was drawn there because her boyfriend of 9 months, her best friend, and three of her first cousins reside in that area. The mother stated that she did not have plans to marry

her boyfriend but that their relationship could develop into a more meaningful one in time. While her parents live approximately 2½ hours away from Omaha by car, the mother stated that she has no other relatives and only one close friend in Nebraska. However, Casey does have family in Omaha on his father's side, including grandparents, one uncle, one aunt, and two cousins.

The mother also testified that there were several potential activities in the Denver area that she thought would benefit Casey. For example, the mother stated that her cousins and her boyfriend's parents each own an acreage and horses near Denver, suggesting that Casey would be able to enjoy horseback riding there. Beyond that, the mother stated that Casey would have access to a wide range of outdoor activities in Denver in which she was anxious to get him involved, such as skiing, golfing, camping, hiking, canoeing, and kayaking. The mother said that she did not feel living in Omaha would afford Casey as much potential to experience these activities. Although the father's parents also have an acreage and access to horses in Nebraska, the father acknowledged that he has never taken Casey horseback riding there.

The father testified that he was opposed to the mother's application to remove Casey to Colorado because his visitation with Casey would be inhibited. The father testified that he had never missed any scheduled visitation and that he spent time with Casey throughout the year equal to approximately one-half of all the days in the year. The father does not want Casey to leave the state. He stated at the modification hearing, "I want to be a part of my son's life. I want him to be a part of my family's life. I hate to miss out on him starting little league, him starting school, being at the parent-teacher conferences; basically, seeing my son grow up."

The father also testified that the mother had told him that he had "no rights" and "no say" and that she "gave [him] all the rights [he] had regarding [Casey]." The mother had been asked about this earlier in cross-examination. She had responded, "I don't recall. I — in what — I don't believe I did. I don't think I did." A follow-up question was asked: "Could that be something

that you would have said, you have no rights, you have what you're going to get, something to that effect?" Her answer was "No, I don't — please —." A recess was then taken. A tape recording was produced that showed that in fact this remark was made by the mother in a telephone conversation with the father.

The father also offered the testimony of Gerry Phaneuf, the director of career services at Creighton University. Phaneuf testified that his experience in the career services field included employment at Creighton University, the University of Nebraska-Lincoln, and Texas Tech University in Lubbock, Texas. His responsibilities have included organizing workshops specifically for women searching for employment. Both parties stipulated that Phaneuf is an expert in the area of employment opportunities in Nebraska.

Phaneuf testified that there were abundant job opportunities in the Omaha corporate rental industry for which the mother was qualified. Further, Phaneuf said that the pay in those jobs would be comparable to that at Cort in Denver. He also noted the cost of living in Omaha was slightly less than in Denver. However, Phaneuf allowed that the positions he spoke of were in related fields, such as leasing business products and equipment, and not the mother's specific expertise in the area of corporate furniture rentals.

After hearing the evidence and observing the witnesses, the district court entered an order granting the mother leave to remove Casey from Nebraska to Denver, increasing the father's support obligation to $525 per month, expanding the father's visitation to include 1 week during the Christmas holiday season and at least 1 week during every other Easter break or spring vacation. In addition, the district court ordered that certain travel expenses be equally shared by the parties. The father timely appealed the modification order to the Court of Appeals.

In a two-to-one decision, the Court of Appeals reversed the district court's removal order, reinstated the previous visitation schedule, and affirmed the district court's order for an increase in the father's child support obligation. *Farnsworth v. Farnsworth*, 6 Neb. App. 597, 576 N.W.2d 476 (1998). We granted the mother's petition for further review.

## III. ASSIGNMENTS OF ERROR

In her petition for further review, the mother contends, in summary, that the Court of Appeals erred in (1) determining that the district court abused its discretion when it found that the mother had proved a legitimate reason for leaving the state and that it was in the minor child's best interests to continue to live with the mother, (2) determining that the mother produced no evidence to conclude that the Omaha Public Schools are inadequate or that the Denver Public Schools are superior, and (3) setting forth a five-prong test for the determination of what is in the best interests of a minor child by utilizing factors that had not been set forth by the Nebraska Supreme Court at the time of the trial.

## IV. STANDARD OF REVIEW

 Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Poll v. Poll*, 256 Neb. 46, 588 N.W.2d 583 (1999). A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and just result. *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998).

 Generally, before a court will permit the removal of a minor child from the jurisdiction, the custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent. *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994).

## V. ANALYSIS

Of all the disputes that courts are called upon to resolve, parental relocation cases such as this one are among the most complicated and troubling. That is because the interests of the custodial parent, who often has legitimate, sound reasons for wanting to move to a distant state, are mutually exclusive to the interests of the noncustodial parent, who commonly has a compelling desire to continue frequent, regular contact with the child. Complicating matters further, courts must ultimately per-

form the difficult task of weighing the best interests of the child, which may or may not be consistent with the personal interests of either or both parents. See, generally, e.g., *Harder v. Harder, supra* (reciting child's-best-interests rule and stating that mother had legitimate interest in moving to Arizona, father had close relationship with child, and guardian ad litem concluded that both parties were fit and proper persons to have custody).

### 1. CURRENT APPROACH

To prevail on a motion to remove a minor child, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Id.* After clearing that threshold, the custodial parent must next demonstrate that it is in the child's best interests to continue living with him or her. *Id.* Of course, whether a proposed move is in the best interests of the child is the paramount consideration. *Evenson v. Evenson*, 248 Neb. 719, 538 N.W.2d 746 (1995).

Despite the child's best interests being the central concern, we have never explicitly set forth factors to be considered in determining a child's best interests in a removal case. See *Farnsworth v. Farnsworth*, 6 Neb. App. 597, 576 N.W.2d 476 (1998). Given that, the Court of Appeals utilized, and the mother complained of, a five-pronged test synthesized from approaches in other jurisdictions. *Id.* While the Court of Appeals took a commendable, groundbreaking approach, we nonetheless find it necessary to independently consider all the appropriate factors to apply in cases such as this. In determining which factors to include in the analysis of a child's best interests, we examine persuasive decisions from other jurisdictions, in the absence of any contrary intention being expressed by our Legislature.

### 2. THREE CONSIDERATIONS

Although sometimes articulated differently, other jurisdictions employ three broad considerations in deciding whether removal is in a child's best interests. First, the courts typically examine each parent's reasons for seeking or opposing the move. Second, the courts assess the potential that the move holds for enhancing the quality of life for the child and the custodial parent. Finally, the courts examine the impact such a move will have on contact between the child and the noncusto-

dial parent (when viewed in the light of reasonable visitation arrangements). See, e.g., *Tropea v. Tropea*, 87 N.Y.2d 727, 665 N.E.2d 145, 642 N.Y.S.2d 575 (1996); *Jones v. Jones*, 110 Nev. 1253, 885 P.2d 563 (1994); *In re Marriage of Herkert*, 245 Ill. App. 3d 1068, 615 N.E.2d 833, 186 Ill. Dec. 29 (1993); *Yannas v. Frondistou-Yannas*, 395 Mass. 704, 481 N.E.2d 1153 (1985); *Cooper v. Cooper*, 99 N.J. 42, 491 A.2d 606 (1984), *modified, Holder v. Polanski*, 111 N.J. 344, 544 A.2d 852 (1988).

### (a) Each Parent's Motives

As stated earlier, the legitimacy of the custodial parent's motive for moving is already a threshold question in our state. See *Harder v. Harder*, 246 Neb. 945, 524 N.W.2d 325 (1994). However, we recognize the wisdom in having both parents' motives play a further role in ascertaining a child's best interests. Thus, if a trial court finds the custodial parent's motives for moving are legitimate, the court should go on to consider the motives of each parent, in proposing and resisting the move, in its analysis of the child's best interests. While some legitimate motives might seem less compelling than others—for example, meeting the demands of a second marriage as compared to accommodating a specific health concern—none should be summarily rejected at this stage of the analysis without weighing the other considerations and how they all come to bear on the overall impact on the child.

### (b) Child's Quality of Life

There are a number of factors that may assist trial courts in assessing the second consideration regarding the potential for enhancing the quality of life for the child and the custodial parent. For instance, courts have considered: (1) the emotional, physical, and developmental needs of the child, *Yannas v. Frondistou-Yannas, supra*; (2) the child's opinion or preference as to where to live, *id.*; (3) the extent to which the custodial parent's income or employment will be enhanced, *Jones v. Jones, supra*; (4) the degree to which housing or living conditions would be improved, *id.*; (5) the existence of educational advantages, *id.*; (6) the quality of the relationship between the child and each parent, *Tropea v. Tropea, supra*; (7) the strength of the child's ties to the present community and extended family there,

*id.*; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents, *id.*; and (9) the living conditions and employment opportunities for the custodial parent, because the best interests of the child are interwoven with the well-being of the custodial parent. See, e.g., *Yannas v. Frondistou-Yannas, supra*; *Cooper v. Cooper, supra.* This list should not be misconstrued as setting out a hierarchy of factors. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted.

### (c) Impact on Noncustodial Parent's Visitation

Obviously, the range of impacts that a move will have on the contact between the child and the noncustodial parent is as wide as the distance from Maine to Hawaii. Therefore, this consideration focuses on the ability of the noncustodial parent to maintain a meaningful parent-child relationship. *Tropea v. Tropea*, 87 N.Y.2d 727, 665 N.E.2d 145, 642 N.Y.S.2d 575 (1996). When looking at this consideration, courts typically view it in the light of the potential to establish and maintain a reasonable visitation schedule. See, e.g., *Cooper v. Cooper*, 99 N.J. 42, 491 A.2d 606 (1984).

Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id.* Of course, the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness. *In re Marriage of Herkert*, 245 Ill. App. 3d 1068, 615 N.E.2d 833, 186 Ill. Dec. 29 (1993). Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in this analysis. *Jones v. Jones*, 110 Nev. 1253, 885 P.2d 563 (1994).

In addition to the noncustodial parent's loss of access and the reasonableness of a modified visitation schedule, another factor to be considered is the noncustodial parent's interest in securing custody, as well as the feasibility and desirability of a change in custody. Where the ties between a child and the noncustodial parent and the extended family or community are so strong as to make a long distance move undesirable, transferring custody may be a realistic alternative to forcing the custodial parent to

remain in the state. *Tropea v. Tropea, supra.* Similarly, where the custodial parent's motives for relocating are legitimate and compelling and the move would enhance the quality of life for the child, the court in a proper case may examine the feasibility of a parallel move by an involved and committed noncustodial parent as an alternative to restricting a custodial parent's mobility. *Id.*

### (d) Summary of Approach

We conclude that the foregoing considerations and factors would be helpful to trial courts in determining what is in a child's best interests. Any list of suggested criteria is not meant to be exhaustive, nor will every factor be present in each case. However, these considerations and factors serve as appropriate guideposts to trial courts in determining what is in the child's best interests, and we adopt the approach for use in parental relocation cases.

### 3. APPLICATION TO PRESENT CASE

Applying the criteria set forth above to the instant case, we determine that the district court did not abuse its discretion in granting the mother's request for removal. First, the mother met the threshold requirement of proving a legitimate interest in moving. We have recognized that job-related changes are legitimate reasons for moving where there is a "reasonable expectation of improvement in the career or occupation of the custodial parent," *Gerber v. Gerber*, 225 Neb. 611, 619, 407 N.W.2d 497, 503 (1987), and where the custodial parent's new job included a small increase in salary and increased potential for salary advancement, *Jafari v. Jafari*, 204 Neb. 622, 284 N.W.2d 554 (1979). The evidence certainly suggests that the move would advance the mother's career.

The mother testified to conducting an unsuccessful search for better employment in Omaha. Having failed to uncover such opportunities, she turned to Denver, where she obtained a job with greater income, benefits, and career-advancement potential than in her present position. Of course, there was conflicting evidence regarding Omaha job opportunities by way of Phaneuf's testimony. Nevertheless, we have never required a custodial parent to exhaust all possible job

leads locally before securing a better position in another state. Absent some aggravating circumstance, such as an ulterior motive to frustrate the noncustodial parent's visitation rights, significant career enrichment is a legitimate motive in and of itself. We determine that the district court did not abuse its discretion in crediting the mother's testimony and in finding that she proved a legitimate interest in moving.

### (a) Each Parent's Motives

Next, our de novo review of the record does not lead to a conclusion that the district court's findings were clearly untenable insofar as determining that Casey's move to Denver, with his custodial parent, is in the child's best interests. Regarding the first consideration, it appears that the mother and the father each have quite valid reasons for taking their respective positions on the child's removal from Nebraska. On the one hand, the mother desires to better her career, which we have determined is a legitimate and compelling motive.

On the other hand, there is no evidence to suggest that the father's resistance to removal was brought in bad faith or for manipulative purposes. In fact, the father's visitation record indicates that he is primarily concerned with maintaining frequent and regular contact with Casey. This, too, is a compelling motive and, indeed, a central concern. Thus, it appears that the motives of each party are equally balanced.

### (b) Child's Quality of Life

Moving on to the next consideration, the record suggests that the move will enhance the quality of life for the mother and Casey. To begin with, the mother's testimony indicates that her new job presents greater income and career-advancement potential, which are two avenues toward a better standard of life.

The mother also testified that Denver provides better housing conditions, as she would live on the third floor of an apartment building in a neighborhood that she regarded as safe and nicer than the one where she lived in Omaha. While the mother acknowledged that there are neighborhoods in Omaha as nice as the one in Denver, she noted that they are more expensive. Moreover, the mother discussed how moving to Denver would improve living conditions for her and Casey insofar as they

would have access to a wider variety of outdoor activities and professional sporting events. Although access to outdoor activities and sporting events is commendable, the quality and quantity of access to such events is not significantly greater in Denver than in Omaha; thus, this factor was given little weight in our de novo review.

Next, the mother claimed that her proposed residence in Denver would present educational advantages for Casey. Although the mother cited generalized research she had performed as support for her opinion, the evidence is not compelling enough one way or the other to determine whether Denver schools are in some ways superior to Omaha schools. This factor was given little or no weight in our de novo review.

As for the quality of the relationship between Casey and each parent, the record suggests that both the mother and the father enjoy a close, nurturing relationship with Casey. Both spend roughly equal amounts of time with Casey, and each involves him in healthy activities when they are together. For example, the father takes Casey to dinner and movies and has him spend time with his extended family. Meanwhile, the mother bakes cookies and plays outside with Casey, and entertains his friends at her house.

In summary, the improved housing, living, and employment factors do not suggest that the district court abused its discretion on this second consideration.

### (c) Impact on Noncustodial Parent's Visitation

Reviewing the final consideration, it appears that the district court fashioned a reasonable visitation schedule that will maintain a meaningful parent-child relationship between the father and Casey. Of course, the frequency of the father's visitation will be somewhat curtailed by a move from Omaha to Denver. Still, the distance between Omaha and Denver is not one that prevents the father from seeing Casey on a regular basis. Moreover, the district court ordered that the total number of days that the father spends with Casey be increased during the Christmas and spring vacations to partially make up for the diminished frequency of visits.

We determine that the district court fashioned as reasonable a visitation schedule as possible given the fact that one parent

resides in Omaha and the other parent resides in Denver. There was no abuse of discretion in the district court's consideration of this factor.

## VI. CONCLUSION

Parental relocation issues are among the most difficult issues that trial courts face in postdivorce proceedings. Once broken by divorce, a family cannot be put back together in precisely the same way. Among other things, the relationships between the child and each of the parents and the parents to each other are necessarily different. As such, it is often difficult for courts to balance the noncustodial parent's accustomed close involvement in a child's everyday life with the custodial parent's chance to embark on a new or better life or to form a new family unit. It is for this reason that such determinations are matters initially entrusted to the discretion of the trial judge, and the trial judge's determination is to be given great deference absent an abuse of discretion.

To assist the trial courts in making these difficult decisions, we have established guideposts for determining the child's best interests in parental relocation cases. In the present case, we are cognizant that the district court did not make particularized findings on the legitimacy of the mother's motives or on the considerations we have established in determining Casey's best interests. Nevertheless, our de novo review of the record finds abundant support for the trial court's determination.

As such, it cannot be said that the district court abused its discretion or deprived the noncustodial parent of a substantial right or just result in the instant case. Therefore, we reverse the judgment of the Court of Appeals and remand the cause with directions to reinstate the judgment of the district court.

REVERSED AND REMANDED WITH DIRECTIONS.

WHITE, C.J., not participating.