IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SCHROEDER V. SCHROEDER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ELIZABETH M. SCHROEDER, APPELLEE AND CROSS-APPELLANT,

V.

JACOB D. SCHROEDER, APPELLANT AND CROSS-APPELLEE.

Filed April 15, 2025.    No. A-24-350.

Appeal from the District Court for Seward County: JAMES C. STECKER, Judge. Affirmed as modified.

Nicholas R. Glasz and William R. Taylor for appellant.

Ryan M. Swaroff and Abbie L. DeWitte, of Rembolt Ludtke, L.L.P., for appellee.

RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

Husband appeals, and wife cross-appeals, from a decree entered by the district court dissolving their marriage. The husband challenges the court's determination of custody of their minor children and its distribution of marital property. The wife challenges the district court's failure to require the refinancing of the marital residence and contends the court erred in its removal analysis. We affirm the decree as modified below.

## II. BACKGROUND

Jacob D. Schroeder and Elizabeth M. Schroeder were married in 2011 and have three children, Callie, born in 2007, Torie, born in 2013, and Caden, born in 2016. In July 2022, Elizabeth filed a complaint for dissolution of marriage in the district court for Seward County.

- 1 -

In September 2022, the court entered temporary orders which included findings that Jacob was facing a felony charge arising out of an incident in July in which he physically assaulted Elizabeth while Callie was present in the home, and as a result, a domestic abuse protection order had been issued against Jacob. The court awarded Elizabeth temporary physical and legal custody of the children subject to Jacob's supervised parenting time. Jacob was also ordered to pay child support, and the parties were ordered to participate in mediation.

In May 2023, Jacob filed a motion to appoint a guardian ad litem (GAL) for the children, which was granted. In June, Elizabeth filed a motion to amend her initial complaint to include a request to remove the children to Florida, which the court granted. In March 2024, a trial was held on Elizabeth's amended complaint for dissolution. At trial, the following evidence was adduced.

The GAL testified that an equal division of parenting time between Jacob and Elizabeth was not in the children's best interests because of the limited time the children had spent with Jacob during the pendency of the case and the history of domestic violence in the family home. Also, Callie had not spoken to Jacob since the domestic abuse incident in July 2022. However, the GAL believed it was in Callie's best interests to reestablish a relationship with Jacob, and to do so, counseling visitation between Jacob and Callie would be necessary. Such counseling would be difficult to facilitate if Callie moved to Florida. The GAL also explained the children were involved in the Nebraska community where they had been raised and had relationships with their extended family who lived in the area which made it beneficial for them to remain in Nebraska.

The GAL report was introduced at trial. The report included Jacob's probation order which stated he had been found guilty of two counts of third degree domestic assault, one count of second degree false imprisonment, and one count of negligent child abuse. The GAL stated that a review of the services completed by Jacob showed that he had "made progress."

Callie was questioned by the judge in chambers with both attorneys present. To maintain the confidentiality of Callie's testimony, its contents will be discussed generally as necessary to our analysis.

Elizabeth testified that the parties began their relationship in 2006 and temporarily separated in 2009 because Jacob was physically, emotionally, and verbally abusing her and drinking heavily. They separated again in August 2021 for similar reasons. Until their final separation in 2022, Jacob's drinking and abuse were continuous issues.

According to Elizabeth, throughout the marriage, Jacob would push her out of their bed, slam her head into floors and walls, rip out her hair, hold her down, sit on her, and twist her arms behind her back. He also exhibited controlling behaviors such as monitoring Elizabeth's location and accusing her of infidelity.

Elizabeth witnessed Jacob be "violent or rough" with the children during their marriage. If the children were not listening, he would "wrench down on their ears" and "wrench their arms back." Jacob would also pick up Caden by his neck "either to kick him, or hit him before he threw him onto his bed." Jacob threw objects at Torie and Callie. Most recently, Jacob spanked the two younger children with wooden spoons on their bare bottom in a combination of discipline and anger. If Elizabeth stood up for the children during these times, Jacob would tell her to "shut up."

When explaining why she had filed for divorce, Elizabeth recounted the incident of domestic abuse that took place in July 2022. Jacob had returned home after he had been out drinking. He started "yelling and getting angry" with Elizabeth when she refused his request to

have sex and accused her of cheating because she would not let him touch her breasts. He shoved Elizabeth out of their bed and admitted he had been tracking her by placing "Airpods" in her car.

Jacob backed Elizabeth into the closet, and she asked for a divorce. Jacob replied that he would take the children, the money, and "make her life a living hell." He pushed her into the hallway and her "whole arm went through" the wall. As the scuffle continued, Elizabeth's head hit the floor, and her shin split open after hitting a bench near the door. Jacob placed her in a chokehold, and she was unable to breathe.

Elizabeth was "on the bridge [sic] of blacking out" but was able to say, "please let go," and Jacob did so. After she caught her breath, Elizabeth called the police. When they arrived, Jacob was arrested and charged with felony strangulation and four other misdemeanors. All of the children were home during the incident, and Callie came upstairs after Jacob had been arrested. Callie's demeanor led Elizabeth to believe she had been awake for a period of time and was scared. Jacob eventually pled no contest to four misdemeanor charges and received a sentence of 2 years' probation.

After the July 2022 incident, Elizabeth filed for and was granted a domestic abuse protection order, which was received as an exhibit at trial. The petition included dates and factual allegations of specific incidents of abuse including incidents in March 2020 and January 2022, and the petition alleged that there had been at "least one instance every year since [they had] been together" in which Jacob had "been physically abusive." The July 2022 incident was recounted in the affidavit as well and the alleged events mirrored those recounted in Elizabeth's testimony.

Elizabeth's motion for protection order renewal was also received at trial. The district court granted the motion and Elizabeth's protection order was renewed in July 2023.

Since the incident and subsequent separation in July 2022, Elizabeth had moved to a different county in Nebraska where she rented a four-bedroom, three-bathroom townhome for $2,025 per month. She intended to continue living there if her request to move the children to Florida was denied. However, Elizabeth wanted to move to Florida so she could be closer to her mother and stepfather, who had relocated to Florida from Nebraska in May 2022. If Elizabeth was allowed to move the children to Florida, she and the children would live in a four-bedroom, two-bathroom home owned by Elizabeth's parents on a rent-to-own basis for $2,000 per month.

Although Callie had mixed feelings about moving to Florida, the Florida high school which she would attend offered business classes and had a volleyball team, which Callie was interested in. Other schools offered agricultural, technical, and theatre courses, which appealed to the two younger children's interests. Currently, the children attended a small K-12 school near the marital home, which did not offer such a particularized curriculum. If Elizabeth was not allowed to relocate to Florida, the children would transfer to schools located in the Nebraska county in which Elizabeth lived at the time of trial.

Elizabeth had explored job opportunities in Florida and interviewed at a hospital near the prospective home. The pay would be comparable to what she earned in Nebraska, and the Florida hospital was willing to offer her an incentive for her master's degree. Elizabeth believed moving to Florida would be financially beneficial because Florida's cost of living was lower than Nebraska's, there is no state income tax, and her childcare costs would decrease because her mother and stepfather had agreed to watch the children. At the time of trial, Callie was the primary babysitter of the younger two children and Elizabeth did not pay for childcare.

Elizabeth also desired to move from Nebraska because she felt humiliated in the community where she and Jacob lived during their marriage. She had heard "gossip" which misrepresented the events of the July 2022 assault and painted her in a negative light. She did not feel safe continuing to live in Nebraska because of the proximity to Jacob. She feared that she could not protect her own safety in the event her protection order was not renewed again.

Overall, Elizabeth felt moving to Florida would provide her with a support system to raise her children, improve her financial circumstances, give both her and the children more opportunities, and help them to be safe. In contrast, she did not feel supported by Jacob's family and did not have a support system in Nebraska.

Following Elizabeth's testimony, both Jacob's father and brother testified. They agreed that Jacob had informed them the July 2022 incident was instigated by Elizabeth, and Jacob's brother stated that he believed Elizabeth was responsible for Jacob's subsequent convictions.

Jacob testified and stated he was the primary caretaker of the children during the parties' marriage. Elizabeth often worked late, and he was responsible for picking up the children from school and cooking them dinner. He also frequently transported them to their extracurricular activities, which he enjoyed being involved in. Jacob wished to have more parenting time and agreed therapeutic visitation with Callie would be appropriate. He believed Elizabeth was fit to have custody of the children and he introduced a proposed parenting plan in which parenting time was equally divided between him and Elizabeth.

Jacob denied having physically abused Elizabeth; rather, he explained that most arguments between them involved Elizabeth hitting him and him physically restraining her from doing so. Regarding the July 2022 incident, the only thing he did to Elizabeth was try to throw her out of the house. It was Elizabeth who instigated the incident and Jacob was predominantly trying to defend himself. However, he acknowledged that Elizabeth was a victim, and he recognized that he should have never "put [his] hands on her that night."

Jacob denied having abused the children and stated he had a "very good and loving" relationship with each of them prior to the filing of the present action. He acknowledged that he had let the children down through his actions, and that he wanted to rehabilitate his relationship with them, which would not be possible if they were removed to Florida.

At the time of trial, Jacob had abstained from alcohol since February 2023. He had been ordered to and had completed various courses in accordance with his probation and had participated in substance abuse treatment.

Exhibits were received which showed Jacob had been working overtime since his separation from Elizabeth because he needed additional income to pay the mortgage on the marital home, child support payments, and other bills associated with the residence. Jacob, however, requested he be allowed to keep the marital home because it was built on his family's land, and it had sentimental value.

Following the trial, the district court entered a decree dissolving the parties' marriage and awarding Elizabeth sole legal and physical custody of the children, subject to Jacob's parenting time. The court ordered an equitable distribution of the marital property and awarded Jacob the marital home. Further, the court denied Elizabeth's request for removal, finding it would not be in the children's best interests to allow the move to Florida. Jacob now appeals and Elizabeth cross-appeals.

## III. ASSIGNMENTS OF ERROR

Jacob assigns that the district court erred by (1) imposing limits on his parenting time in excess of what was reasonably calculated to protect the children or Elizabeth from harm, (2) failing to make "special written findings" as required by Neb. Rev. Stat. § 43-2932(3) (Reissue 2016), and (3) failing to make an equitable distribution of the marital estate.

Elizabeth's cross-appeal assigns that the district court (1) abused its discretion by failing to order Jacob to refinance the joint debt on the marital home within a specific time frame, and (2) erred by failing to consider credible evidence of domestic intimate partner abuse within the removal framework.

## IV. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Verzal v. Verzal*, 29 Neb. App. 904, 962 N.W.2d 563 (2021). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## V. ANALYSIS

### 1. JACOB

#### (a) District Court Did Not Err by Imposing Limits on Jacob's Parenting Time

Jacob assigns as error the district court's imposition of "limits on [his] parenting time in excess of what was reasonably calculated to protect the children or [Elizabeth] from harm." Brief for appellant at 6. The court's order discloses it granted Jacob parenting time every other Saturday from 1 p.m. to Sunday at 6 p.m., and after he completes probation, his parenting time will commence every other Friday after school, or from 5 p.m. if there is no school, until Sunday at 6 p.m. However, the court also found unsupervised visitation with Callie was not in her best interests until after she and Jacob had participated in counseling.

The district court's adopted parenting plan includes "safety provisions" in accordance with § 43-2932. These provisions include: Jacob shall not consume alcohol or illegal drugs prior to or during his parenting time, he shall test for these substances prior to his parenting time, the parties shall communicate through the Talking Parents application, Jacob shall be required to report any probation violation or failed or missed tests and sanctions, the children shall be allowed access to their smartwatches and cellphones during Jacob's parenting time, and Jacob shall refrain from any abusive, violent, or threatening behavior.

Jacob argues the limitations on his parenting time amount to a violation of his constitutional right to the care, custody, and control of his children, and asserts the proceedings were unfair because the court was biased against him. He also contends the court failed to comply with Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) which requires the court to consider the children's

relationship with each parent prior to the commencement of the action when determining their best interests.

We agree that fit parents have a constitutionally protected right to the care, custody, and control of their children. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). However, a court may restrict this right under certain circumstances and is always required to provide a parenting plan that is within the children's best interests. See §§ 43-2923 and 43-2932.

Although Jacob argues the court failed to consider one factor of the best interests analysis, no single factor is determinative. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). Section 43-2923(6) requires a court to consider multiple factors in determining the best interests of the child, including:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

Here, the district court found there was credible evidence of domestic intimate partner abuse and that the parenting plan adopted was in the best interests of the children. The evidence showed Jacob had been convicted of crimes arising from his July 2022 assault of Elizabeth and was on probation at the time of the trial. Jacob had pled no contest to two charges of third degree domestic assault, second degree false imprisonment, and negligent child abuse. The court recognized that Jacob has a good relationship with the two younger children but adopted Elizabeth's proposed parenting plan providing the limited every other weekend parenting time. Jacob's proposed plan included a week-on, week-off schedule which the GAL found not in the best interests of the minor children due to the domestic violence and the limited visitation that had been occurring at the time of trial.

Although Jacob may have had very good relationships with the children prior to the incident of July 2022, the events of that evening affected those relationships, particularly his relationship with Callie. Jacob pled no contest to charges of both domestic assault and negligent child abuse. This evidence led the district court to conclude that the provisions within the safety plan were necessary pursuant to § 43-2932. Based upon the district court's concern of the children's safety and Jacob's continued sobriety, we find no abuse of discretion in the district court's decision to limit Jacob's parenting time to every other weekend.

Jacob summarily contends that the district court

(1) did not properly comply with . . . § 43-2932(3), improperly ignored the GAL and other testimony when determining what was in the minor children's best interest, and abused its

discretion in its finding by being punitive towards [Jacob;] (2) demonstrated actual bias against him; (3) violated his parental rights.

Brief for appellant at 15. With the exception of § 43-2932(3) which we discuss below, Jacob does not assign any of these as error, nor does he provide any analysis or further argument. Therefore, we do not address them. See *Quiles v. Callazo*, 33 Neb. App. 180, 12 N.W.3d 518 (2024) (alleged errors must be both specifically assigned and argued to be considered by appellate court).

### (b) District Court Not Required to Make Written Findings

Jacob assigns that the district court failed to make "special written findings" as required by § 43-2932(3). Section 43-2932(3) states in relevant part:

> If a parent is found to have engaged in any activity specified in subsection (1) of this section, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection.

As evidenced by the plain language of the statute, special written findings are required when the court awards legal or physical custody to a parent who has engaged in domestic violence. Because the district court did not award Jacob either legal or physical custody of the children, the court was not required to make special written findings as contemplated by this section. For purposes of completeness, however, we observe that in its decree, the district court cited § 43-2932 and the requirement that special findings be made. It further stated that it found Jacob had "engaged in counseling and treatment and that at this time, the victims are adequately protected." We thus reject this assignment of error.

### (c) District Court Erred in Marital Estate Distribution

Jacob assigns the court erred in failing to make an equal distribution of the marital estate. He argues the court did not classify all of the parties' property as marital or nonmarital, did not value the marital assets and liabilities of the parties, and did not calculate and divide the net marital estate between the parties in accordance with Neb. Rev. Stat. § 42-365 (Reissue 2016). He asserts the absence of a table reflecting the court's calculations deprives the parties of the necessary level of transparency needed to assess the court's calculations.

Although the decree does not contain a table, the court categorized, valued, and allocated the parties' debts and assets in narrative form. Jacob does not dispute the values assigned to the property, nor contend it was incorrectly categorized or allocated. Rather, he simply states the court generally failed to categorize, value, and allocate the marital property. Because even a cursory review of the record reveals that the district court categorized, valued, and allocated the marital estate, we reject this portion of Jacob's argument.

However, Jacob also argues that the district court did not "calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. It simply tendered the conclusion that [Jacob] shall pay an equalization payment to [Elizabeth] of $421,155.00, failing to provide the detail necessary to substantiate its equalization amount of $421,155.00." Brief for appellant at 17. We disagree that the district court failed to calculate and

divide the net marital assets; it did so in narrative form in its decree. However, Jacob is correct that the equalization payment was tendered as a conclusion without any showing of how the district court arrived at a payment of $421,155. Elizabeth concedes that the court erred in calculating the equalization payment and proposes that the accurate calculation results in an equalization payment from Jacob of $222,489.52.

In support of the revised equalization payment, Elizabeth converted the court's narrative values and distributions into a chart, totaled the marital estate and its division, and arrived at the equalization number she proposes. Comparing Elizabeth's chart to the district court's order, we note minor errors relating to the value of cash awarded to Jacob and the distribution of a $5,000 check. We have therefore recalculated the valuation and division of the marital estate using the district court's narrative and the joint property statement upon which it relied. This results in an equalization payment of $216,248.51. Our calculations are attached to this opinion as Attachment 1, and we modify the decree to reflect an equalization payment of $216,248.51 due from Jacob to Elizabeth within 120 days of this opinion. The district court's division of the marital estate is otherwise affirmed.

## 2. ELIZABETH

### (a) District Court Abused its Discretion in Failing to Order Jacob to Refinance Marital Home

Elizabeth assigns as error that the district court abused its discretion in failing to order Jacob to refinance the joint debt on the marital home within a specific time frame. She requests we modify the decree to require Jacob to refinance the mortgage and remove her name from any debt obligation tied to the home. Due to the difference in interest rates between the existing mortgage and a new mortgage, Jacob testified he preferred to keep the mortgage that he had "and come up with a different way to pay the equalization payment." He requested a year to do so. Elizabeth's counsel asked that if the home were granted to Jacob, that the mortgage be refinanced out of Elizabeth's name within 90 days and that her equalization payment be made at the time of refinance. The court's decree awarded the property to Jacob subject to the mortgage, ordered him to pay the equalization payment within 120 days, but was silent on any obligation to refinance the home or remove Elizabeth's name from the mortgage.

We have previously held that a court abuses its discretion when it fails to require a party to remove the other party's name from the mortgage because it can tie the other party to the debt for years to come. See *Verzal v. Verzal*, 29 Neb. App. 904, 962 N.W.2d 563 (2021). Here, the court awarded Jacob the marital home subject to the mortgage, but the decree does not require Jacob to refinance the mortgage in his name only. The parties' mortgage for the marital home has an outstanding balance of $233,048.49 with monthly payments of approximately $1,821. If Jacob does not refinance the mortgage to remove Elizabeth's name, her credit could be tied to the marital residence and the debt for years into the future.

We agree with Elizabeth that the court abused its discretion in failing to require Jacob to refinance the marital home. We therefore modify the decree of dissolution to require Jacob to refinance the mortgage on the marital residence and remove Elizabeth's name from any debt obligation thereon by August 13, 2025.

## (b) District Court Did Not Err in its Removal Analysis

Elizabeth assigns the district court erred in failing to consider domestic abuse in determining whether she could remove the children from Nebraska. She argues that the court erroneously considered the *Farnsworth* factors, which do not incorporate a consideration of domestic abuse, as exhaustive. She contends that that the omission of domestic abuse considerations from the *Farnsworth* factors is contrary to determining best interests under the Parenting Act. Finally, she argues that had this been an initial paternity action, the court would have been required to consider the domestic abuse under an analysis of parental fitness and the best interests of the children when deciding whether the children could be removed to Florida.

Upon our de novo review, we find no abuse of discretion in the district court's denial of Elizabeth's request to remove the children to Florida. We disagree that the district court failed to consider Jacob's domestic abuse when considering Elizabeth's request to remove the children to Florida as explained below.

In Nebraska, when removal is requested in a dissolution action, the court is required to utilize the framework set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999) to determine whether to grant the request. Within this framework, the threshold question is whether the party requesting removal demonstrated a legitimate reason for removing the child from the state. See *id*. Once the party requesting removal makes a threshold showing of a legitimate reason for removal, the court then determines whether the move is in the child's best interests. See *id*. This threshold showing is not required in an initial paternity action. See *Franklin M. v. Lauren C.*, 310 Neb. 927, 969 N.W.2d 882 (2022). Nonetheless, it is appropriate to apply the *Farnsworth* general considerations in each situation. See *Franklin M., supra*.

Under *Farnsworth, supra*, in determining the child's best interests, the court considers each parent's motives for seeking or opposing the move. See *id*. It also considers the potential the move holds for enhancing the quality of life for the child and custodial parent by analyzing the following: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the custodial parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages, (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parents; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. See *Farnsworth, supra*. Depending on the circumstances of a particular case, a court may assign more weight to one factor or a combination of factors. *Id*. Lastly, the court considers the ability of the noncustodial parent to maintain a meaningful parent-child relationship. *Id*. When looking at this consideration, courts typically view it in the light of the potential to establish and maintain a reasonable visitation schedule. *Id*.

These three considerations are not intended to be exhaustive and should serve as guideposts in determining whether removal is in the children's best interests. See *id*. The best interests of the child is the primary consideration in determining whether to grant a request for removal. See *Franklin M., supra*.

The district court did not make a threshold finding that Elizabeth had a legitimate reason for moving; rather, its discussion begins with a best interest analysis. In analyzing the motives of the parties, the district court found Elizabeth's motive was her desire to live closer to her mother and that this was a legitimate desire. In *Schrag v. Spear*, 290 Neb. 98, 107, 858 N.W.2d 865, 874 (2015), the Nebraska Supreme Court reasoned:

> Although the district court did not make a specific finding as to whether [the custodial parent] had a legitimate "reason" to move to New York, it examined the legitimacy of her motives for relocating. As we noted in *Farnsworth v. Farnsworth*, the legitimacy of the custodial parent's motive for a proposed relocation is part of the "threshold question" of whether the parent has a legitimate reason for moving, and also plays a "further role in ascertaining a child's best interests" if the threshold showing is made. Thus, we consider the district court's findings with respect to the legitimacy of [the custodial parent's] motives as pertinent to whether she established a legitimate reason for the move.

The district court's finding with respect to the legitimacy of Elizabeth's motives is pertinent to whether she established a legitimate reason for the move. Neither party addresses this threshold consideration and assuming without deciding it constitutes a legitimate reason for removal, the district court did not abuse its discretion in determining it was not in the children's bests interests that they be removed to Florida. See *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014) (declining to address whether father had legitimate reason to relocate because holding on best interest was dispositive).

Elizabeth first argues that the court failed to consider Jacob's domestic abuse when deciding the removal issue. The court's decree rebuts that argument. In discussing the factor relating to the relationship between Jacob and the children, the court noted that "Callie was traumatized by [Jacob's] assault of [Elizabeth]" and required counseling to address the issues "stemming from the assault on July 23, 2022." In its discussion of the likelihood that a move would antagonize hostilities between the parties, it stated that "[d]istance for [Elizabeth] from [Jacob] is important for her." Therefore, contrary to Elizabeth's assertions, the court did consider Jacob's domestic intimate partner abuse of Elizabeth when analyzing her removal request.

Elizabeth next argues that the district court treated the *Farnsworth* factors as an exhaustive list. We agree that the *Farnsworth* factors are guideposts and not exhaustive factors. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). However, as stated above, the district court did consider Jacob's domestic abuse in its removal analysis. Elizabeth contends that the district court abused its discretion when finding that the children's ties to the community weighed against removal because the court did not acknowledge how Jacob's "false narrative" regarding the July 2022 assault affected Elizabeth. Brief for appellee at 35. And while we do not disagree that Elizabeth's ties to the community, or lack thereof, would weigh in favor of her moving to Florida, this does not necessitate a finding that it is in the best interest of the children to do so. As recognized in *Farnsworth, supra*, 257 Neb. at 248-49, 597 N.W.2d at 597:

> Of all the disputes that courts are called upon to resolve, parental relocation cases such as this one are among the most complicated and troubling. That is because the interests of the custodial parent, who often has legitimate, sound reasons for wanting to move to a distant state, are mutually exclusive to the interests of the noncustodial parent, who commonly has

- 10 -

a compelling desire to continue frequent, regular contact with the child. Complicating matters further, courts must ultimately perform the difficult task of weighing the best interests of the child, which may or may not be consistent with the personal interests of either or both parents.

Here, based upon the children's lifelong connection to their present community, coupled with the extended family residing there and the need for Callie and Jacob to restore their relationship through therapeutic counseling, the district court did not abuse its discretion in finding this factor weighed against removal.

Nor do we agree with Elizabeth's contention that the *Farnsworth* factors are inconsistent with the best interests factors of the Parenting Act. Elizabeth posits that had this been an initial paternity action in which one of the parents sought to live outside the state with the child, the court would be required to consider domestic violence because the issue of removal must be resolved on the basis of parental fitness and the best interests of the child. She argues that in such a situation, the court must consider domestic violence as a factor of the children's best interests under § 43-2923(6)(e) of the Parenting Act. Conversely, in a dissolution case, the court considers the child's best interests as set forth in § 43-2923 in awarding custody but considers the *Farnsworth* factors to determine the child's best interests for removal.

Regardless of whether the relocation issue is raised in an initial paternity action or in a dissolution action, the court is required to consider the child's best interests as set forth in the Parenting Act. Section 43-2923(6) requires that in determining custody and parenting arrangements, the court shall consider the best interests of the child and sets forth mandatory factors to consider. In an initial paternity action, the court determines custody taking into consideration the requesting parent's plan to move. See *Franklin M. v. Lauren C.*, 310 Neb. 927, 969 N.W.2d 882 (2022). In an initial dissolution action, the court first determines custody (taking into consideration the § 43-2923(6) factors) and then determines whether the requesting parent should be allowed to relocate with the child. Because the *Farnsworth* factors are not exhaustive, there is nothing that precludes a district court from considering domestic abuse when determining whether it is in the child's best interest to be removed from the state. Such evidence should already be before the court for purposes of determining custody. Accordingly, we reject Elizabeth's argument that the *Farnsworth* factors are inconsistent with the Parenting Act's best interests factors.

When the district court's decree is read as a whole, it is clear that it considered Jacob's domestic abuse when deciding issues of custody, parenting time, and removal.

## VI. CONCLUSION

For the foregoing reasons, we find no abuse of discretion in the district court's decree as it relates to child custody, parenting time, and removal. We affirm the decree as modified to reduce Jacob's equalization payment to $216,248.51 and require him to refinance the mortgage on the marital residence by August 13, 2025.

AFFIRMED AS MODIFIED.

- 11 -

| ASSETS | AMOUNT | Elizabeth (Plaintiff) | Jacob (Defendant) |
|---|---|---|---|
| **Division and Valuation of Marital Property** | | | |
| **Real Property:** | | | |
| 1711 140th Street, Garland, Nebraska | $560,000.00 | | $560,000.00 |
| | | | |
| **Bank Accounts:** | | | |
| Union Bank x9247 | $ 6,066.59 | $ 6,066.59 | |
| Union Bank x5217 | $ 223.47 | | $ 223.47 |
| Jones Bank x8075 (closed by Defendant 7.26.22) and placed into Jones Bank x9306 | $ 43,384.99 | | $ 43,384.99 |
| Jones Bank x9024 | $ 2,992.76 | | $ 2,992.76 |
| Tenneco Health Savings | $ 561.69 | | $ 561.69 |
| | | | |
| **Retirement Accounts:** | | | |
| Bryan Retirement | $ 71,837.82 | $ 71,837.82 | |
| Tenneco 401K | $112,697.78 | | $112,697.78 |
| Charles Schwab | $ 2,178.97 | | $ 2,178.97 |
| | | | |
| **Vehicles:** | | | |
| 2002 Buick Lesabre VIN: 1G4HP54K724195707 | $ 2,675.00 | | $ 2,675.00 |
| 2005 Chevrolet Trailblazer LS | $ 100.00 | | $ 100.00 |
| 2014 Chevrolet Silverado VIN: 3GCUKREC1EG328811 | $ 17,000.00 | | $ 17,000.00 |
| 2018 Chevrolet Traverse VIN: 1GNEVGKW4JJ221377 | $ 20,310.00 | $ 20,310.00 | |
| | | | |
| **Farm Equipment:** | | | |
| Farm Truck VIN: AA182KHB13572 | $ 3,400.00 | | $ 3,400.00 |
| Grain Truck | $ 3,000.00 | | $ 3,000.00 |
| Planter | $ 100.00 | | $ 100.00 |
| Anhydrous Applicator | $ 570.00 | | $ 570.00 |
| Auger Wagon | $ 800.00 | | $ 800.00 |
| 2-wheel flatbed | $ 1,000.00 | | $ 1,000.00 |
| Welder and Supplies | $ 1,500.00 | | $ 1,500.00 |
| Zero Turn Lawn Mower | $ 4,000.00 | | $ 4,000.00 |

| | | | |
|---|---|---|---|
| Combine | $ 7,500.00 | | $ 7,500.00 |
| | | | |
| **Household Goods, Equipment and Misc. Property** | | | |
| Gun Safe | $ 400.00 | | $ 400.00 |
| Cash | $ 0.00 | | $ 0.00 |
| 2013 Polaris Ranger 4x4 Ltd Ed | $ 2,500.00 | | $ 2,500.00 |
| Larson Delta-Conic Power Boat | $ 800.00 | | $ 800.00 |
| Hail Proceeds | $ 10,599.26 | $ 10,599.26 | |
| Bushnell Scope | $ 650.00 | | $ 650.00 |
| Foundation Stock | $ 750.00 | | $ 750.00 |
| Hunting Decoys | | | |
| Hunting Blind | $ 250.00 | | $ 250.00 |
| Mossberg 835 | $ 250.00 | | $ 250.00 |
| Winchester 1400 | $ 400.00 | | $ 400.00 |
| Ruger Mark II | $ 650.00 | | $ 650.00 |
| Rocky River LAR15 | $ 800.00 | | $ 800.00 |
| Hoyt Bow | $ 300.00 | | $ 300.00 |
| 2 Impact 737 actions | $ 2,000.00 | | $ 2,000.00 |
| Hellfire brakes | $ 300.00 | | $ 300.00 |
| Trigger Tech Triggers (2) | $ 250.00 | | $ 250.00 |
| Ruger SR1911 | $ 600.00 | | $ 600.00 |
| Vortex Razor Optic Scope | | | |
| Gun Tripod | | | |
| Check from Caleb Schroeder | $ 5,000.00 | $ 5,000.00 | |
| Physical Fitness Equipment | $ 600.00 | $ 600.00 | |
| Pampered Chef | $ 200.00 | $ 200.00 | |
| Patio Furniture | $ 400.00 | $ 400.00 | |
| Binoculars | $ 400.00 | | $ 400.00 |
| Sofa and Chair & Theater Furniture | $ 2,000.00 | | $ 2,000.00 |
| Masterpiece Arms Stock | $ 1,000.00 | | $ 1,000.00 |
| Custom Rifle Barrell & Trigger (for camo gun with scope & tripod) | $ 2,000.00 | | $ 2,000.00 |
| Construction and Farm Tools | $ 500.00 | | $ 500.00 |
| Diamond Ring | $ 4,000.00 | $ 4,000.00 | |
| | | | |
| **TOTAL ASSETS** | $899,498.33 | $119,013.67 | $780,484.66 |
| | | | |
| **DEBTS** | | | |
| Mortgage | $233,048.49 | | $233,048.49 |
| Traverse Loan (Capital One) | $ 13,649.00 | $ 13,649.00 | |

| | | | |
|---|---|---|---|
| Chase CC x1434 | $ 3,720.97 | $ 3,720.97 | |
| Chase (Amazon) CC x2888 | $ 3,306.00 | | $ 3,306.00 |
| Ag Loan x7848 | $ 9,989.44 | | $ 9,989.44 |
| | | | |
| **TOTAL DEBTS** | $263,713.90 | $ 17,369.97 | $246,343.93 |
| | | | |
| **Net** | | $ 101,643.70 | $534,140.73 |
| **Equalization Payment** | | $216,248.51 | ($216,248.51) |
| | | | |
| **FINAL DISTRIBUTION** | | $317,892.21 | $317,892.22 |